**E-FILED**
Monday, 31 August, 2015  04:58:14 PM
Clerk, U.S. District Court, ILCD

### UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KEVIN W. CULP, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | No.: 14-3320 |
| | ) | |
| LISA MADIGAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OBJECTION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

NOW COME Defendants, by and through their attorney, Lisa Madigan, Attorney General of Illinois, and hereby object to Plaintiffs' motion for preliminary injunction:

## BACKGROUND

Plaintiffs seek a preliminary injunction barring enforcement of the residency requirement of the Firearm Concealed Carry Act, 430 ILCS 66/40(a), thereby permitting the plaintiffs and their members to apply for an Illinois concealed carry license. Section 40 of the Carry Act permits nonresidents to apply, pursuant to rules of the Illinois State Police ("ISP"), for a concealed carry license if the nonresident is a resident of a state or U.S. territory with laws related to firearm ownership, possession, and carrying that are substantially similar to Illinois' requirements. The purpose of this requirement is to ensure public safety and prevent violent crime. Currently, Hawaii, New Mexico, South Carolina, and Virginia are "substantially similar," based on information provided by the jurisdictions in response to ISP's request for information.[1] (Ex. 1, Affidavit of Trame, at ¶¶ 26–29.)

The individual plaintiffs attest they are residents of Wisconsin, Colorado, Missouri, Iowa, Pennsylvania, or Indiana; would apply for a concealed carry permit if able; and would carry concealed firearms in Illinois but fear criminal prosecution. The individuals suggest they

---

[1] ISP has proposed amended rules that may expand the number of states deemed to be "substantially similar" under the Carry Act. 39 Ill. Reg. 10717, 10740–41.

maintain "premises" in Illinois (*see*, *e.g.*, Doc. 18-1 at ¶ 2), but whether that is intended is unclear. A few attest they work in Illinois (Docs. 19 (military station), 19-2, 19-3); while others attest they "occasionally traverse" Illinois to visit relatives (Doc. 18-1); "frequently" visit and travel through Illinois to other states (Doc. 18-4); visit family in and make "periodic business trips" to Illinois (Doc. 19-4); or spend half of their time in Chicago (Doc. 19-1). One individual does not attest to any travel to or through Illinois. (Doc. 18-3). The organizational plaintiffs attest they have "many" nonresident members and conclude those unidentified members would apply for a concealed carry permit if able. (Docs. 18-2, 18-5, 21.)

Pursuant to 20 Ill. Admin. Code § 1231.110(c), ISP sent surveys to other jurisdictions requesting information about their firearm laws to determine whether those jurisdictions had "substantially similar" firearm laws. (Ex. 1 at ¶¶ 26–29.) ISP asked whether the jurisdiction regulated who may carry firearms in public, reported via national databases persons authorized to carry and persons denied, and prohibited persons voluntarily (in the last five years) or involuntarily admitted to mental health facilities from possessing or using firearms. Colorado, Maine, Maryland, Massachusetts, Nevada, Pennsylvania, and Rhode Island did not respond to Illinois' requests. Hawaii, New Mexico, South Carolina, and Virginia stated they met all of the criteria. The remaining jurisdictions stated they did not have laws or procedures concerning one or more of the criteria. For example, and relevant to the plaintiffs' states of residence, Indiana, Iowa, Missouri, and Wisconsin stated they did not prohibit use or possession of firearms based on voluntary admissions to mental health facilities in the last five years and did not have a mechanism of tracking that information for their residents. (Ex. 1 at ¶ 29.) Iowa and Missouri also reported they do not participate in reporting licenses via the National Law Enforcement Telecommunications System, one of the systems used by Illinois to assess firearm qualifications and monitor continued qualifications. (Ex. 1 at ¶¶ 6, 10, 13, 14, 28–29.)

Defendants request this Court deny Plaintiffs' motion for preliminary injunction because Plaintiffs have failed to establish the elements necessary for such extraordinary relief and because the balances of the equities weigh strongly in favor of denial.

## STANDARD

"A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. CentiMark Corp.*, --- F.3d ----, No. 14–2758, 2015 WL 4561195 at *4 (7th Cir. July 29, 2015). The party seeking the injunction must show that "(1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Id.* If this initial threshold is met, the Court then weighs "the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted." *Id.* Particularly important in a case involving the regulation of firearms and public safety, the Court must also consider how an injunction might impact nonparties and the "public interest." *See id.*; *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.,* 549 F.3d 1079, 1086 (7th Cir. 2008).

## ISSUES AND ARGUMENT

### I.   Plaintiffs Cannot Demonstrate a Likelihood of Success.

Plaintiffs argue the residency requirement violates the Second Amendment right to keep and bear arms, the Fourteenth Amendment rights to equal protection and due process, and the Privileges and Immunities clause of Article IV of the United States Constitution, relative to certain nonresidents who wish to carry firearms in Illinois. Plaintiffs' various constitutional claims ultimately reduce to a Second Amendment challenge: whether the State may prohibit nonresidents from states without substantially similar firearm laws from obtaining Illinois concealed carry licenses consistent with the right to bear arms. Plaintiffs are not likely to succeed.

Public carriage of firearms in Illinois is conditioned, with some exceptions, on possession of an Illinois concealed carry license. The restriction applicable to nonresidents from states without substantially similar firearm laws does not violate the right to bear arms in public because it is reasonably related to Illinois' substantial interest in disarming those not qualified to carry firearms due to criminal history, mental illness, or other factors. Illinois has limited access to out-of-state information concerning nonresidents' qualifications to carry firearms in public in Illinois; unless a state gathers that information for the purpose of enforcing its own, substantially similar firearm laws, Illinois has no way to confirm that a nonresident from that state is qualified to carry a loaded firearm in public in Illinois, and would have no way to monitor that nonresident's ongoing qualifications were it to issue a license. Because the residency requirement does not violate the right to bear arms, Plaintiffs' various constitutional challenges premised on that right also fail.

**A.    The Carry Act and Related Regulations Do Not Violate the Second Amendment.**

Plaintiffs argue the residency requirement of the Carry Act constitutes a ban in violation of the Second Amendment as applied to them because, as residents from states lacking substantially similar firearm laws, they are prohibited from publicly carrying a firearm in Illinois. However, an examination of the Illinois firearm regulation scheme reveals that Illinois allows qualified individuals to possess firearms and carry them in public for the purpose of self-defense. Because that is all the Second Amendment requires, Plaintiffs' Second Amendment challenge fails.

**1.    The Illinois Firearm Regulation Scheme**

The Second Amendment confers two related individual rights: the right to keep arms and the right to bear arms. *See Dist. of Columbia v. Heller*, 554 U.S 570, 582-85 (2008); *McDonald v. Chicago*, 561 U.S. 742, 791 (2010) (applying Second Amendment to states). The right to keep

arms is merely the right to possess them; the right to bear arms is the right to carry them in public for self-defense. *Heller*, 554 U.S at 582-84. Illinois has instituted separate regulatory schemes for each right. The right to keep arms is governed by the FOID Card Act, which allows qualified individuals to possess firearms. *See* 430 ILCS 65/1, *et seq*. However, a valid FOID card does not permit its holder to carry firearms in public in a condition suitable for self-defense (*i.e.*, loaded and immediately accessible). *See* 720 ILCS 5/24-1(a)(4), (a)(10); 720 ILCS 5/24-1.6(a)(1), (a)(2), (a)(3)(A-5). Rather, that right—the right to bear arms—is governed by the Firearm Concealed Carry Act, 430 ILCS 66/1, *et seq.*, which allows qualified individuals to *carry* arms.

> ### a.      The FOID Card Act ensures only qualified individuals may possess firearms.

Because nonresident applicants for a concealed carry license must meet all of the qualifications for a FOID Card except residency, 430 ILCS 66/25, 40(c), the FOID Card Act is examined first. The purpose of the FOID Card Act is "to promote and protect the health, safety, and welfare of the public" by "provid[ing] a system of identifying persons who are not qualified to acquire or possess firearms." 430 ILCS 65/1. To effect this purpose without infringing on the Second Amendment right of "law-abiding, responsible citizens" to keep arms, *Heller*, 554 U.S. at 635, the Act relies upon "longstanding prohibitions on the possession of firearms by felons and the mentally ill," *id.* at 626, which are "presumptively lawful regulatory measures," *id.* at 627 n.26. *See* 430 ILCS 65/4(a)(2)(ii) (felony conviction bar); § 4(a)(2)(xiii) (juvenile adjudicated delinquent if would have been felony had applicant been adult); § 4(a)(2)(iv) (patients in mental health facility within past five years); § 4(a)(2)(xvi) (involuntarily mental health commitment). The Act also prohibits issuance to persons who cannot be entrusted with firearms. *See* 430 ILCS 65/4(a)(2)(vii) (orders of protection); § 4(a)(2)(viii) (conviction involving firearm use or possession within past five years); § 4(a)(2)(ix) (conviction of domestic violence offense that constitutes federal prohibitor); § 4(a)(2)(iii) (narcotics addiction); *see also*

*United States v. Yancy*, 621 F.3d 681, 687 (7th Cir. 2010) ("prohibiting illegal drug users from firearm possession" constitutional under Second Amendment because "it is substantially related to the important governmental interest in preventing violent crime"). FOID Card applicants must submit evidence to ISP that none of these disqualifying conditions apply. 430 ILCS 65/4(a)(2).

Illinois' interest in assessing a person's qualifications to possess a firearm does not cease upon the issuance of a FOID Card. After all, an armed, card bearing person who once was qualified but no longer remains so may well present an even greater threat to the public than an armed person who was never qualified; the former's now-undeserved FOID Card might deceive law enforcement as to the threat posed by its holder. *Cf. Coram v. State*, 2013 IL 113867, ¶ 122 (Freeman, J., specially concurring) (issuing FOID card to person federally barred from possession renders system meaningless and threatens the public interest). Accordingly, any disqualifying condition constituting grounds to deny an applicant is also grounds to revoke a FOID Card if the condition is discovered or arises after issuance. *See* 430 ILCS 65/8.

To ensure prompt identification of later-arising disqualifying conditions, the General Assembly created a comprehensive system of reporting obligations to monitor ongoing qualifications. The Illinois Circuit Court Clerks must notify ISP of every final disposition of a criminal charge, delinquency petition, and involuntary commitment proceeding. 430 ILCS 65/8.1; 20 ILCS 2630/2.1(c); 20 ILCS 2630/2.2. The Illinois Department of Human Services ("DHS") must report information relating to mental illness to ISP. 430 ILCS 65/8.1(c); 740 ILCS 110/12(b). Every physician, clinical psychologist, and qualified examiner who determines that a person poses a clear and present danger to himself, herself, or others must report that determination within twenty-four hours to DHS, which in turn "shall immediately update its records and information relating to mental health and developmental disabilities, and if appropriate, shall notify the [ISP]." 430 ILCS 65/8.1(d)(1), (2); 405 ILCS 5/6-1.3.3; *see* 20 Ill. Admin. Code § 1230.120. Finally, every law enforcement official and school administrator must

report dangerous individuals directly to ISP within twenty-four hours. 430 ILCS 65/8.1(d)(2); 405 ILCS 5/6-1.3.3; 20 Ill. Admin. Code § 1230.120.

Nonresidents employed as law enforcement officers, armed security guards in Illinois, or members of the military permanently assigned in Illinois may apply for a FOID Card. 430 ILCS 65/4(a-10); 20 Ill. Admin Code § 1230.20(e). All nonresidents may possess firearms in Illinois without a FOID Card if their "firearms are unloaded and enclosed in a case," 430 ILCS 65/2(b)(9), or if they "are currently licensed or registered to possess a firearm in their resident state," 430 ILCS 65/2(b)(10). In addition, nonresidents may possess firearms in Illinois without a FOID Card if they are "hunters during hunting season, with valid nonresident hunting licenses and while in an area where hunting is permitted" (430 ILCS 65/2(b)(5)); "on a firing or shooting range recognized by [ISP]" (430 ILCS 65/2(b)(7)); or "at a firearm showing or display recognized by [ISP]" (430 ILCS 65/2(b)(8)).

### b.    The Carry Act ensures only qualified individuals may publicly carry loaded and immediately accessible firearms.

The purpose of the Firearm Concealed Carry Act is "to allow for a limited right to carry an operable handgun in public," *People v. Henderson*, 2013 IL App (1st) 113294, ¶ 34. In conjunction with the enforcement mechanisms under the Criminal Code, *see, e.g.* the aggravated unlawful use of a weapon ("AUUW") statute (720 ILCS 5/24–1.6), the Act "protect[s] the public and police officers from the inherent dangers and threats to safety posed by any person carrying in public a loaded and immediately accessible firearm on his person or in his vehicle." *People v. Fields*, 2014 IL App (1st) 130209, ¶ 61.

Because "keep[ing] guns out of the hands of those individuals who by their prior conduct ha[ve] demonstrated that they may not possess a firearm without being a threat to society" and "preventing armed mayhem" are important governmental objectives, *U.S. v. Williams*, 616 F.3d 685, 693 (7th Cir. 2010), Illinois' interest in limiting public carriage to qualified individuals is

even greater than its interest in limiting mere possession of inaccessible and unloaded firearms

under the FOID Card Act, and the qualifications required are correspondingly more

comprehensive. *See also People v. Marin*, 342 Ill. App. 3d 716, 727–28, 795 N.E.2d 953, 962

(Ill. App. 1st Dist. 2003) ("Access to a loaded weapon on a public street creates a volatile

situation vulnerable to spontaneous lethal aggression in the event of road rage or any other

disagreement or dispute.") In addition to possessing and meeting the requirements for a currently

valid FOID Card, an Illinois applicant for a concealed carry license cannot have been convicted

within the past five years of a misdemeanor involving the use or threat of physical force or of

two or more violations relating to driving while under the influence of alcohol or drugs. 430

ILCS 66/25(3). Similarly, the applicant cannot be subject to a pending arrest warrant,

prosecution, or proceeding for an offense or action that could lead to disqualification to own or

possess a firearm (430 ILCS 66/25(4)) or have been in residential or court-ordered treatment for

alcoholism or drug use within the past five years (430 ILCS 66/25(5)). To confirm an applicant's

qualifications, ISP conducts extensive background checks using national, state, and local records,

as well as DHS files. 430 ILCS 66/35. In addition, the Carry Act allows state and local law

enforcement agencies to submit objections to a license applicant. 430 ILCS 66/15; 20 Ill. Admin.

Code § 1231.70.

   As under the FOID Card Act, any disqualifying condition that would constitute grounds

to deny a concealed carry license is also grounds to revoke a license if discovered or arising after

its issuance. 430 ILCS 66/70(a). Because applicants for concealed carry licenses must meet the

requirements for a FOID Card, 430 ILCS 66/25(2); § 40(c), all of the reporting obligations under

the FOID Card Act also serve to monitor concealed carry licensees' ongoing qualifications under

the Carry Act. In addition, disqualifying arrests are identified through daily reports to ISP from

"[a]ll agencies making arrests for offenses which are required by statute to be collected,

maintained or disseminated by the [ISP]." 20 ILCS 2630/2.1(a). All State's Attorneys must

notify ISP of all charges and delinquency petitions filed to identify disqualifying prosecutions. 20 ILCS 2630/2.1(b).

Nonresident applicants for concealed carry licenses must meet the same requirements as resident applicants, except that rather than possessing a FOID Card, they must meet all qualifications to do so except for the Illinois residency requirement. 430 ILCS 66/40(c). As with resident license holders, Illinois has a substantial interest in monitoring the ongoing qualifications of nonresident license holders. Illinois cannot effectively monitor nonresidents' qualifications itself, however; out-of-state mental health providers and law enforcement agencies do not share the reporting obligations of their Illinois counterparts, and out-of-state criminal and mental health databases are not necessarily accessible to ISP or sufficiently comprehensive for Illinois licensing purposes. (*See generally* Ex. 1.) Rather than flatly banning nonresidents from obtaining Illinois concealed carry licenses, however, Illinois allows nonresidents from states "with laws related to firearm ownership, possession, and carrying, that are substantially similar" to Illinois' own to apply for an Illinois concealed carry license. 430 ILCS 66/40(b). A state has a firearm law substantially similar to Illinois' if it:

> regulates who may carry firearms, concealed or otherwise, in public; prohibits all who have involuntary mental health admissions, and those with voluntary admissions within the past 5 years, from carrying firearms, concealed or otherwise, in public; reports denied persons to NICS;[2] and participates in reporting persons authorized to carry firearms, concealed or otherwise, in public through NLETs.[3]

20 Ill. Admin. Code § 1231.10. Because states with substantially similar firearm laws monitor the criminal and mental health qualifications information relevant under Illinois law to assure compliance with their own laws and make that information available through national databases, Illinois can confirm that nonresidents from those states are qualified to hold an Illinois concealed

---

[2] The National Instant Criminal Background Check System maintained by the Federal Bureau of Investigation.  20 Ill. Admin. Code § 1231.10.

[3] The National Law Enforcement Telecommunications System.  20 Ill. Admin. Code § 1231.10.

carry license. Although nonresidents from states without similar laws may not hold Illinois concealed carry licenses, they may transport a concealed firearm in their vehicle without a license if they are not prohibited by federal law from possessing a firearm or by their own states' laws from carrying a firearm in public, as evidenced by their possession of a concealed carry license or permit by their own states, if applicable. 430 ILCS 66/40(e).

## 2.   The Carry Act Does Not Violate the Second Amendment.

Second Amendment challenges are governed by a two-pronged approach. *Ezell v. Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011). First, courts consider the threshold question of "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," *id.* at 704 (7th Cir. 2011) (citing *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir. 2010)), because conduct beyond the scope of the Second Amendment is categorically unprotected. *Id.* at 703. Where, as here, the regulated conduct falls within the scope of the Second Amendment, *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (carriage of firearms outside the home for purpose of self-defense is within scope of Second Amendment right to bear arms), "there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Ezell*, 651 F.3d at 703.

For this second inquiry, "the rigor of . . . judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Ezell*, 651 F.3d at 703. Thus, while "a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end, . . . . laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified." *Id.* at 708. So called "means-end" or

intermediate scrutiny is appropriate where, as here, the burden on Second Amendment rights lies outside of the core of the right. *See Yancey*, 621 F.3d at 683, 685 (applying intermediate scrutiny to categorical prohibition on habitual drug users, even though ban "wildly overinclusive"); *Williams*, 616 F.3d at 692 (applying means-end scrutiny to categorical prohibition on felons); *U.S. v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (applying means-end scrutiny to categorical prohibition on domestic violence misdemeanants).

> **a.      The residency requirement is subject to intermediate scrutiny because it regulates conduct outside the core of the Second Amendment.**

Plaintiffs incorrectly characterize the residency requirement as flatly banning public carriage (or even possession) of firearms by nonresidents (Doc. 20 at 24–25) and argue the requirement impacts a greater class of individuals than the law-abiding Illinois residents at issue in *Moore v. Madigan*, 702 F.3d 933, but review of the Illinois firearm regulation scheme belies this characterization. Illinois allows nonresidents to carry firearms in public with an Illinois concealed carry license where it can confirm, with the assistance of their states of residence, that they are not disqualified from doing so by conduct or mental illness. *See supra*, Section I.A.1.b. Nonresidents may also carry concealed firearms in their vehicles regardless of their home states' regulatory schemes. 430 ILCS 66/40(e); *Holmes*, 241 Ill. 2d at 521. Thus, the regulated conduct is actually much narrower than claimed— the carriage of firearms outside of a vehicle in public by nonresidents whose qualifications to do so as law-abiding, mentally healthy individuals cannot be confirmed. *See Peterson v. Martinez*, 707 F.3d 1197, 1219 (Lucero, J. concurring separately) ("[a]lthough the residency requirement . . . governs the vast majority of individuals . . . , it burdens a relatively small proportion of individuals present in the state at any time.").

This conduct falls outside the core protection of the second amendment—the "right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. "[O]utside the home, firearms rights have always been more limited, because public safety

interests often outweigh individual interests in self-defense." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011). Accordingly, courts have applied intermediate scrutiny to regulation of public carriage. *See Drake v. Filko*, 724 F.3d 426, 430, 430 n.5 (3d Cir. 2013); *Kachalsky v. Westchester*, 701 F.3d 81, 96 (2d Cir. 2012); *Masciandaro*, 638 F.3d at 471.

The regulated conduct is also beyond the core of the Second Amendment because it implicates longstanding prohibitions that are presumptively lawful. *See Heller*, 554 U.S. at 626–27 & n.26; *Williams*, 616 F.3d at 692 (applying intermediate scrutiny to presumptively lawful prohibition against possession of firearms by felons). Here, the regulated conduct lies at the intersection of three presumptively lawful regulations: longstanding prohibitions against possession by the criminally dangerous and mentally ill; public carriage of firearms; and possession by nonresidents. Because the right belongs only to "law-abiding, responsible citizens," *Heller*, 554 U.S. at 626, 627 n.26, 635, the prohibition against nonresidents carrying firearms in public when their mental health and law-abiding qualifications to do so cannot be confirmed must also bear a presumption of lawfulness.

Prohibitions[4] against public carriage and carriage by nonresidents are similarly longstanding. The prohibition against public carriage is rooted in the English right codified by the Second Amendment. *See id.* at 599 (Second Amendment "codified a right inherited from our English ancestors") (internal quotation marks omitted); Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 7-8 (2012) ("[P]ublic regulation of arms is as old as the Norman Conquest or what eighteenth century commentators referred to as the beginning of the English Constitution."). Chief among such regulations was the 1328 Statute of Northampton, stating that "no person shall 'go nor ride armed by Night nor by Day in Fairs, Markets, nor in the Presence of the Justices or

---

[4] As noted, Illinois merely regulates public carriage based on the ability to confirm qualifications.

other Ministers nor in no Part elsewhere.'" Charles, 60 Clev. St. L. Rev. at 7–8 (quoting Statute of Northampton, 2 Edw. 3, c. 3 (Eng. 1328)). The statute was not only a prohibition on arms in the public concourse, but "[i]ts tenets also provided the basis of English legal reform for centuries to come," *id*. at 13, with three states—Massachusetts, North Carolina, and Virginia— "expressly incorporat[ing]" the Statue of Northampton "immediately after the adoption of the Constitution," *id.* at 31–32 (citing 2 The Perpetual Laws, of the Commonwealth of Massachusetts, from the Establishment of its Constitution to the Second Session of the General Court, in 1798 259 (Worcester, Isaiah Thomas 1799); Francois-Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North-Carolina 60-61 (Newbern 1792); A Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are Now in Force 33 (Augustine Davis 1794)). The "legal tenets" underlying the Statute of Northampton persisted beyond the colonial period, and "[t]hroughout the nineteenth century numerous States enacted different versions." Charles, 60 Clev. St. L. Rev. at 40–41.

The prohibition against carriage of firearms by nonresidents dates back nearly a century. *See Heller v. Dist. of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) (noting that "*Heller*[, 554 U.S 570, 626, 627 n.26 (2008),] considered 'prohibitions on the possession of firearms by felons' to be 'longstanding' although courts did not start to enact them until the early 20th century") (*citing* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009)). For example, in 1909, West Virginia conditioned carriage of a pistol, revolver, "or any other dangerous or deadly weapon of like kind and character" on

> obtain[ing] a state license to carry any such weapon *within any county in this state* by publishing a notice in some newspaper published *in the county in which he resides*, setting forth his name, residence and occupation, and that on a certain day he will apply *to the circuit court of his county* for such state license . . . .

Act of Feb. 16, 1909, ch 51, 1909 W. Va. Acts 394, 395-96 (emphasis added). Similarly, a 1919 Montana statute allowed Montana judges to grant "permission to carry or bear concealed or otherwise a pistol or revolver," provided that "[n]o such permission shall be granted any person who is not a citizen of the United States, and who has not been an *actual bona fide resident of the State of Montana* for six (6) months immediately next preceding the date of such application." Act of Mar. 3, 1919, ch. 74, § 5, 1919 Mont. Acts 147, 148 (emphasis added). A 1921 Missouri statute prohibited a person from buying, borrowing, or receiving a "pistol, revolver or other firearm of a size which may be concealed upon the person, unless the buyer, borrower, or person receiving such weapon shall first obtain . . . a permit authorizing such person to acquire such weapon," where

> [s]uch permit shall be issued by the circuit clerk *of the county in which the applicant for a permit resides in this state*, if the sheriff be satisfied that the person applying for the same is of good moral character and of lawful age and that the granting of the same will not endanger to public safety.

Act of Apr. 7, 1921, § 2, 1921 Mo. Laws 692 (emphasis added).

In sum, because public carriage of firearms by nonresidents in public outside of their vehicles when their mental health qualifications or criminal history cannot be confirmed is not at the core of the Second Amendment, the challenged statute is subject to intermediate scrutiny, in which "the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Williams*, 616 F.3d at 692. The government has demonstrated that mental health status and criminal history status are critical to the safety of law enforcement and the public. The regulation at issue is substantially related to that objective. The motion for preliminary injunction should be denied.

b.     **The Carry Act is reasonably related to Illinois' substantial interest in preventing unqualified people from publicly carrying loaded firearms.**

Plaintiffs' challenge to the Carry Act fails. The prohibition of firearm carriage outside the vehicle by nonresidents whose qualifications cannot be confirmed is reasonably related to the important governmental interest in "suppressing armed violence" by "keep[ing] guns out of the hands of presumptively risky people[,] . . . . including criminals, . . . mental defectives, armed groups who would supplant duly constituted public authorities, and others whose possession of firearms is similarly contrary to the public interest." *Yancey*, 621 F.3d at 683; *see also Fields*, 2014 IL App (1st) 130209, ¶ 57 ("[p]romoting and ensuring the safety of both the general public and police officers by limiting the accessibility of firearms in public to a less responsible or less mature group of people constitutes a substantial or important interest."); *see also Osterweil v. Bartlett*, 819 F.Supp.2d 72, 88 n.14 (collecting residency requirements of various states) (N.D.N.Y. 2011) *vacated on other grounds,* 738 F.3d 520 (2nd Cir. 2013). Limiting the right to carry a firearm in public to people whose qualifications can be confirmed is certainly reasonably related to Illinois' interest in preventing unqualified people from carrying firearms in public. *See Yancey*, 621 F.3d at 684–85 (right to bear arms tied to concept of virtuous citizenry and unvirtuous may be disarmed).

Plaintiffs argue "there are ways short of a ban to ensure that only qualified non-residents obtain an Illinois CCL," but fail to offer a single practicable solution. For example, Plaintiffs assert nonresidents are no less competent or untrustworthy than residents and that if a nonresident is not qualified, the remedy is denial of a license. (Pls.' Br. 27.) However, this statement eludes the issue. The "peculiar evil" at stake is not that an individual nonresident is presumed to be less safe than a resident, but rather that nonresidents from dissimilar states, as a class, are substantially immune from the fundamental inquiries necessary to establish the requisite qualifications in the first place. (*See generally* Ex. 1.)

Nonetheless, even if there were more "narrow" ways to ensure a nonresident's qualifications, regulation of conduct beyond the core of the Second Amendment, as here, need be only substantially related to the government interest. *Williams*, 616 F.3d at 692. This "means-end" inquiry merely requires "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Ezell*, 651 F.3d at 708.[5] Here, the fit is reasonable, allowing nonresidents whose qualifications can be confirmed with their states of residency to carry firearms in public with a valid Illinois concealed carry license and allowing nonresidents whose qualifications cannot be confirmed to carry concealed firearms in their vehicles without one. 430 ILCS 66/40(e); *cf. Holmes*, 241 Ill. 2d at 521.

Further, restricting public carriage to residents and nonresidents whose qualifications can be confirmed *is* the least restrictive means necessary. There is no way for Illinois to ensure that nonresidents from states without similar firearm laws are qualified to publicly carry firearms without endangering Illinois' citizens. Information on disqualifying out-of-state mental health conditions, arrests, and prosecutions is not reliably available through national databases. (Ex. 1 at ¶¶ 9–25.) Out-of-state mental health providers and law enforcement officials are under no obligation to notify Illinois should they discover a nonresident's disqualifying condition (so that an undeserved license can be revoked) and do they have the knowledge of Illinois law necessary to identify such a condition. (Ex. 1 at ¶¶ 16–25.) Plaintiffs insist they and their members are law-abiding, responsible citizens, but because they are nonresidents from states without similar firearm regulations and reporting methods, Illinois is unable to confirm these assurances of responsibility. Indeed, some of the individual plaintiffs hail from Colorado or Pennsylvania, two states that did not even respond to Illinois' surveys. Illinois cannot effectively evaluate and

---

[5] Thus, the fact that Illinois' current administration has proposed new rules that rebalance the interests of public safety and the individual in favor of a less comprehensive monitoring scheme for nonresidents does not render the current rules unconstitutional.

monitor the qualifications of citizens of states who will not even respond to requests for basic information.

Plaintiffs' request for a preliminary injunction barring enforcement of the residency requirement essentially requires Illinois to simply give unknown numbers of nonresidents the benefit of the doubt, responding only *after* violence is committed. Plaintiffs ask for nonresidents to be treated *more* favorably than residents, in that nonresidents from dissimilar states are functionally immune to many of the same regulations and monitoring mechanisms applicable to residents.[6] The Second Amendment does not require public safety to be sacrificed in favor of a "wait and see" approach, nor does the Second Amendment require nonresidents to be treated more favorably than residents. Illinois is entitled to insist on meaningful assurances that residents and nonresidents alike are qualified to publicly carry loaded firearms.

> **B.** **Illinois' restriction on public carriage of firearms by nonresidents whose qualifications cannot be confirmed and monitored does not violate the Privileges and Immunities Clause of Article IV, Section 2.**

Plaintiffs offer no authority, and Defendants have found none, establishing the right to bear arms is a "privilege" under the Privileges and Immunities Clause of Article IV. Rather, "[m]any, if not most [Supreme Court] cases expounding the Privileges and Immunities Clause have dealt with th[e] basic and essential activity" of pursuing "a common calling." *United Bldg. & Constr. Trades Counsel of Camden County & Vicinity v. Mayor & Counsel of Camden*, 465 U.S. 208, 219 (1984); *see also Conn. ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 95 (2d Cir. 2003) (collecting cases). Only those activities that are "sufficiently basic to the livelihood of the Nation . . . fall within the purview of the Privileges and Immunities Clause . . . ." *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64 (internal quotation marks omitted). Equal treatment is required "[o]nly with respect to those 'privileges' and 'immunities' bearing on the vitality of the

---

[6] Plaintiffs do not challenge the requirements of the FOID Card Act or the Carry Act unrelated to residency, and therefore concede that those requirements may be constitutionally applied.

Nation as a single entity." *Id.* Given the extensive history of regulation of public carriage and public carriage by nonresidents, the right to bear arms cannot be sufficiently basic to the livelihood of the Nation nor can it bear on the vitality of the Nation as a single entity so as to come within the Clause.

Even if the right to bear arms were a "privilege" under Article IV, Illinois' restrictions on public carriage by nonresidents from states without similar firearm laws would not violate Article IV. When a protected privilege or immunity is implicated by a discriminatory law, the State may defend the discrimination by showing that "(i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective." *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 284 (1985)); *Crotty*, 346 F.3d at 94. The availability of less restrictive means is relevant to the consideration of whether the challenged discrimination is adequately related to the State's objective. *Sestric v. Clark*, 765 F.2d 655, 658 (7th Cir. 1985).

The restriction at issue clearly satisfies this burden. The restriction on nonresidents holding Illinois concealed carry licenses is grounded in Illinois' inability to confirm and monitor their qualifications for their licenses—that is, the unavailability of adequate assurances that nonresidents would not endanger the public were they armed. *See supra*, Section I.A.1.b; I.A.2.b. Preventing public carriage by potentially dangerous nonresidents whose qualifications cannot be confirmed is a substantial reason to restrict nonresidents' carriage rights. *Cf. W.C.M. Window Co. v. Bernardi*, 730 F.2d 486, 497 (7th Cir. 1984) (state could "keep out nonresidents who had been exposed to some communicable disease of which the state was still substantially free" on ground that they constitute "a peculiar source of evil").

 Illinois' "monitoring interest is, in essence, an interest in continually obtaining relevant behavioral information," and Illinois has "just as much of an interest, for example, in discovering signs of mental instability demonstrated [out of state] as in discovering that instability [in state]."

*Bach v. Pataki*, 408 F.3d 75, 91 (2d Cir. 2005) *overruled on other grounds*, *McDonald*, 561 U.S. at 748. Reporting obligations placed upon Illinois mental health professionals and law enforcement officials ensure that disqualifying conditions which arise in Illinois can be identified and acted upon, but there are no similar mechanisms available outside of Illinois if a nonresident's own state does not monitor such conditions for its own purposes. Accordingly, in considering the constitutionality of New York's restrictions on firearm licenses to nonresidents, the Second Circuit in *Bach* found it "self-evident" that "other States . . . cannot adequately play the part of monitor for the State of New York or provide it with a stream of behavioral information approximating what New York would gather." *Id.*; *see also Peterson v. Martinez*, 707 F.3d 1197, 1220–24 (10th Cir. 2013) (Lucero, J., separately concurring) (concluding residency requirement for concealed carry license did not violate Second Amendment or privileges and immunities clause under intermediate scrutiny because requirement is substantially related to important government interest in assessing qualifications); *Peterson v. LaCabe*, 783 F. Supp. 2d 1167, 1175 (D. Colo. 2011) (residency requirement sufficiently related under Article IV to "substantial interest in restricting permits to those persons whose [qualification] information is more readily available" because State showed that "it is much more difficult and expensive to obtain information pertinent to an applicant's eligibility for a concealed handgun permit from out-of-state sources"). Other states have little incentive to gather and make available to Illinois information that has no independent relevance to those states, *see Bach*, 408 F.3d at 92–93; "Motivation is incentive driven—without these incentives, there is little reason to expect effective monitoring, if any." *Id.* at 93.

    For this reason, the restriction on issuing Illinois concealed carry licenses to nonresidents from states that will not monitor those nonresidents' qualifications bears a substantial relationship to Illinois' objective of protecting the public by preventing unqualified people from

holding licenses to carry firearms in public. Therefore, Plaintiffs' Privileges and Immunities claim fails.

### C.   The Residency Requirement Does Not Violate the Equal Protection Clause of the Fourteenth Amendment Because It Is Rationally Related to Illinois' Legitimate Interest in Protecting the Public.

Plaintiffs argue the Carry Act unconstitutionally discriminates between resident and nonresident applicants for Illinois concealed carry licenses, thereby restricting the Second Amendment rights of similarly situated nonresident applicants. Plaintiffs' challenge fails, however, because restrictions on firearm possession and carriage by nonresidents whose qualifications cannot be confirmed is rationally related to Illinois' legitimate interest in protecting the public from the readily apparent dangers of firearms in the hands of the unqualified.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Plaintiffs' claim fails at this initial threshold because nonresidents from states without substantially similar firearm laws are not similarly situated to Illinois residents or to nonresidents from states with substantially similar firearm laws because their qualifications to possess an Illinois concealed carry license cannot be confirmed or monitored. *See Bach*, 408 F.3d at 91-94; *Peterson v. LaCabe*, 783 F. Supp. 2d at 1175. Indeed, it is precisely because Plaintiffs are not "within [Illinois'] jurisdiction" for purposes of the background checks and monitoring functions vital to ensuring safe, responsible gun use that Plaintiffs are not similarly situated. *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Use of the phrase 'within its jurisdiction' . . . confirms[] the understanding that the protection of the Fourteenth Amendment extends to anyone, citizen or stranger, who *is* subject to the laws of a State . . . . *[U]ntil he leaves the jurisdiction* . . . he is entitled to the equal protection of the

laws that a State may choose to establish." (second emphasis added). When nonresidents depart Illinois for their home states, they leave Illinois' jurisdiction and thereby immunize themselves from the reach of Illinois' monitoring interests unless those states monitor similar information and make that information available to Illinois. Thus, Plaintiffs are *not* "subject to the laws of [Illinois]" in the crucial reference frame—Illinois' monitoring and reporting requirements—and therefore are not similarly situated.

But even if Plaintiffs' claim survived this initial inquiry, it would fail to clear the next hurdle, because the challenged statutes readily pass scrutiny under the rational basis test. If a statutory classification does not impermissibly interfere with a fundamental constitutional right and is not based on a "suspect" class, courts apply the rational basis test. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976); *Sweeney v. Pence*,767 F.3d 654, 668 (7th Cir. 2014).[7] Here, the restrictions on nonresidents from dissimilar states do not violate their Second Amendment rights, *see supra* Section I.A.2.b, nor do Plaintiffs constitute a suspect class. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 211–12 (5th Cir. 2012) (applying rational basis to equal protection challenge to age-based firearm restriction where persons under 21 had no fundamental right under second amendment and age was not a suspect classification); *Mosley*, 2015 IL 115872, ¶ 41 (equal protection challenge to firearm regulation subject to rational basis test where regulation did not burden core of Second Amendment right or discriminate against suspect class). Therefore, defendant's claim

---

[7] Plaintiffs' reliance on the dicta in *Sklar v. Byrne*, 727 F.2d 633 (7th Cir. 1984) is misplaced. There, the court merely restated the general rule, but did not find a fundamental right at issue or apply strict scrutiny. Plaintiffs must demonstrate *impermissible* interference with a fundamental constitutional right to trigger heightened scrutiny of the classification. *Murgia*, 427 U.S. at 313. Plaintiffs are not entitled to a greater level of scrutiny under an equal protection claim than is applicable to their asserted fundamental right. *See NRA*, 700 F.3d at 211–12. Because their Second Amendment claim fails, their equal protection claim is subject to rational basis scrutiny.

is subject to rational basis review, under which the statute is upheld if it "bears a reasonable relation to any proper legislative purpose." *Sweeney*, 767 F.3d at 670.[8]

Illinois' residency requirement withstands this highly deferential scrutiny. *See Mathews v. De Castro*, 429 U.S. 181, 185 (1976) (under rational basis test, challenged statutes warrant "a strong presumption of constitutionality"). Prohibiting nonresidents from holding Illinois concealed carry licenses when their qualifications to do so cannot be confirmed is a reasonable way to promote the legitimate interest in preventing violence and injury from firearms possessed by those unqualified to carry them. *See supra* Section I.A.2.b. That some nonresidents otherwise qualified to possess an Illinois concealed carry license cannot obtain one because their qualifications cannot be confirmed or monitored does not render the prohibition unreasonable. The Equal Protection Clause "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans,* 517 U.S. 620, 631 (1996). Here, the classifications are reasonably drawn to coincide with Illinois' inability to confirm and monitor the qualifications of nonresidents from certain states to carry a firearm without endangering the public. Therefore, Plaintiffs' equal protection claim fails.

### D.     The Residency Requirement Does Not Violate the Due Process Clause.

Plaintiffs' Due Process Claim fails for the same reasons their claim under the Second Amendment fails. Indeed, the Due Process analysis is subsumed in the Second Amendment analysis. *See Williams v. Ind. State Police Dep't*, --- F.3d ----, 2015 WL 4772639 at *1 (7th Cir.

---

[8] Plaintiffs' cases offer no support for heightened scrutiny. In *Williams v. Vermont*, 472 U.S. 14, 23–24 (1985), the challenger was a resident and the Court invalidated the statute under rational basis. In *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869 (1985), the Court found no legitimate state interest. In *Minton v. St. Bernard Parish Sch. Bd.*, 803 F.2d 129, 133 (5th Cir. 1986), the state offered no rationale for its classification. In *Obergefell v. Hodges*, 135 S. Ct. 2584, 2606–07 (2015), the Court did not specify the level of scrutiny applied, but found the state failed to establish any foundation for the harm claimed and described the state's arguments as counterintuitive and illogical.

2015) (where constitutional amendment addresses conduct at issue, "that amendment rather than generalized notions of substantive due process guides such claims."); *McCann v. Mangialardi*, 337 F.3d 787 (7th Cir. 2003). Plaintiffs' claim of procedural due process fails because Plaintiffs cannot establish a Second Amendment right to public carriage by nonresidents whose qualifications to do so cannot be confirmed. Thus, Plaintiffs cannot establish a deprivation of life, liberty, or property to ground their Due Process claim.

## II.   Plaintiffs Have Failed to Establish Irreparable Harm in the Absence of Injunctive Relief.

Although the Seventh Circuit has suggested that violations of Second Amendment rights, like First Amendment rights, are presumed to cause irreparable harm, it did so in the context of Chicago's firing-range ban, which, coupled with Chicago's training requirement, implicated a ban on the core right to possess firearms in the home for self-protection. *Ezell*, 651 F.3d at 699. Thus, if the plaintiffs in that case were correct, the ban "violate[d] their Second Amendment rights every day it remain[ed] on the books." *Id.* at 698. But here, Plaintiffs cannot demonstrate any infringement of their right to defend the "hearth and home" (because Plaintiffs live in other states and because the Carry Act concerns only public carriage) and have failed to demonstrate any continuing violation that would constitute irreparable harm. This is because although Plaintiffs generally state that they travel or visit Illinois anywhere from "occasionally" (Doc. 18-1) to "half of [their] time" (Doc 19-1), no facts are presented indicating that any plaintiff intends to exercise his or her alleged constitutional right to carriage in Illinois at any time prior to this Court's final adjudication on the merits. Similarly, no facts are presented demonstrating that Plaintiffs would not be able to exercise that alleged right, but for the residency requirement, during any hypothetical presence in Illinois. To illustrate, a few Plaintiffs state that they work in Illinois, but do not indicate whether firearms are permitted at their places of work. A few Plaintiffs also state they traverse Illinois on various highways, but carriage inside the vehicle is

permitted under the Carry Act. Further, no showing of injury is made as to any plaintiff organization or any unidentified member thereof. Without any specific information as to where, when, and how Plaintiffs expect to carry in Illinois, Plaintiffs have failed to establish that they will suffer irreparable harm in the absence of preliminary injunctive relief.

Additionally, Plaintiffs seek by their motion the mere ability to apply for a license. Whether Plaintiffs will, in fact, be found qualified to possess a license is entirely speculative. If Plaintiffs are not qualified, there is no harm, irreparable or not. Plaintiffs have therefore not met their burden of demonstrating irreparable harm.

## III.     The Balance of the Equities Weighs in Favor of Denying Injunctive Relief

In considering a motion for preliminary injunction, the Court should pay particular attention to "the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). The Court's "aim is to minimize the costs of a wrong decision." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "A preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved." *Ind. Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 770 (7th Cir. 2001); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 783 (7th Cir. 2011); *but see Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 943–44 (7th Cir. 2006) (status quo not always dispositive).

 In *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012), the Seventh Circuit declared unconstitutional Illinois' previous restrictions on most forms of public carriage, but stayed its mandate for 180 days to permit the General Assembly time to craft new firearm regulations. The General Assembly enacted the current regulatory scheme the same day that the mandate issued in *Moore*. The new laws permitted 270 additional days for implementation, during which the former restrictions remained in effect. *Shepard v. Madigan*, 734 F.3d 748, 750 (7th Cir. 2013). Upon remand from *Moore*, the plaintiffs in one of the cases objected to this additional 270-day

delay. In upholding dismissal of the case as moot, the Seventh Circuit recognized the complexities of firearm regulation and cautioned against granting instantaneous relief, characterizing the plaintiffs' request for an injunction as "unreasonable." *Id.* at 750–51.

> It should have been obvious that transition to a new regime of gun rights would require considered, complex state action, and therefore could not be instantaneous. The plaintiffs don't argue that a new law *could* be implemented within 270 days. In their reply brief they say that "Illinois can take as long as it wants to implement its new concealed carry law; it just cannot continue to enforce its unconstitutional carry ban in the meantime" . . . . That is an untenable insistence on "first day" relief.

*Id.* (dicta).

Here, Plaintiffs seek instantaneous relief in the form of a broad injunction barring enforcement of the residency requirements, thereby permitting any and all nonresidents to apply for concealed carry licenses while leaving Illinois without the means to effectively assess the qualifications of nonresidents. However, the goal of preserving the status quo warrants denial of Plaintiffs' motion in favor of preserving the current firearm scheme pending a full adjudication on the merits. The risk to the public of an erroneous decision involving firearms is self-evident and greatly outweighs the speculative harm to Plaintiffs while this case proceeds. *Moore* and *Shepard* suggest that because of the strong interest in public safety peculiar to Second Amendment cases, the better course, even following a *final* adjudication of unconstitutionality, is to preserve the status quo of enforcement while allowing the State time to craft new regulations correcting the unconstitutional infirmity while preserving the public safety interest. Plaintiffs' insistence on "first day," final and complete relief at this preliminary stage is "unreasonable" and should be denied.

Even if Plaintiffs are entitled to injunctive relief at this stage, their request for relief is overly broad. As noted above, the individual Plaintiffs have not made a convincing showing that irreparable harm is likely to occur prior to this Court's final adjudication on the merits. Further, there is *no* showing of harm whatsoever regarding the unnamed members of the plaintiff

organizations. "An injunction should be narrowly tailored to serve equity's interest." *Burlington*

*N. R.R. v. United Transp. Union*, 862 F.2d 1266, 1280 (7th Cir. 1988). Even if a preliminary

injunction were warranted, the Court should order no more than that ISP permit the named

plaintiffs who have expressed a desire to apply to do so notwithstanding the residency

requirements.

## **CONCLUSION**

In *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010), the Court noted that although

the Second Amendment applies to the states, "[s]tate and local experimentation with reasonable

firearms regulations will continue under the Second Amendment." (alteration in original). Such

experimentation can only work, however, if the states are permitted to insist that their regulations

be satisfied by residents and nonresidents alike. Plaintiffs would foreclose experimentation,

however, in favor of a race to the bottom, whereby each state would be constitutionally required

to permit public carriage of firearms according to the customs of the states with the least

restrictive laws, to the disadvantage of that state's own citizens. The Constitution does not

require adherence to a uniform scheme of least regulation.

Plaintiffs' motion should be denied for failure to establish a likelihood of success or

irreparable harm in the absence of relief and because the balance of the equities strongly favors

denial.

WHEREFORE, Defendants request this honorable Court deny Plaintiffs' motion.

Respectfully submitted,

THE DEFENDANTS,

Joshua D. Ratz, # 6293615
Assistant Attorney General
500 South Second Street
Springfield, IL 62706
Phone: (217) 557-0261
Fax: (217) 524-5091
E-Mail: jratz@atg.state.il.us

LISA MADIGAN, Attorney General, State of
Illinois

By: s/ Joshua D. Ratz_____
         Joshua D. Ratz, # 6293615
         Assistant Attorney General

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KEVIN W. CULP, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No.: 14-3320 |
| | ) | |
| LISA MADIGAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2015 the foregoing Objection to Plaintiffs' Motion for Preliminary Injunction was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing(s) to the following:

David G. Sigale                              dsigale@sigalelaw.com

Respectfully submitted,

s/ Joshua D. Ratz
Joshua D. Ratz, Bar Number 6293615
Assistant Attorney General
500 South Second Street
Springfield, IL 62706
Phone: (217) 557-0261
Fax: (217) 524-5091
E-Mail: jratz@atg.state.il.us