## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

KEVIN W. CULP, MARLOW DAVIS, )
FREDDIE REED-DAVIS, DOUGLAS )
W. ZYLSTRA, JOHN S. KOLLER, )
STEVE STEVENSON, PAUL )
HESLIN, MARLIN MANGELS, )
JEANELLE WESTROM, SECOND )
AMENDMENT FOUNDATION, INC., )
ILLINOIS CARRY, and ILLINOIS )
STATE RIFLE ASSOCIATION, )
                                  )
    Plaintiffs              )
                                    )
    v.                      )     No. 14-CV-3320
                                      )
LISA MADIGAN, in her Official )
Capacity as Attorney General of )
the State of Illinois; )
LEO P. SCHMITZ, in his Official )
Capacity as Director of the )
Illinois State Police, and )
JESSICA TRAME, as Bureau Chief )
of the Illinois State Police )
Firearms Services Bureau, )
                                      )
    Defendants.         )

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

This cause is before the Court on the Motion for Summary

Judgment (d/e 45) filed by Plaintiffs Kevin W. Culp, Marlow Davis,

Freddie Reed-Davis, Douglas W. Zylstra, John S. Koller, Steve Stevenson, Paul Heslin, Marlin Mangels, Jeanelle Westrom, Second Amendment Foundation, Inc., Illinois Carry, and Illinois State Rifle Association and the Motion for Summary Judgment (d/e 43) filed by Defendants Lisa Madigan, in her official capacity as Attorney General of the State of Illinois; Leo P. Schmitz, in his official capacity as Director of the Illinois State Police; and Jessica Trame, as Bureau Chief of the Illinois State Police, Firearms Services Bureau. On August 22, 2017, the Court held a hearing on the motions.

The Court finds that the result in this case is largely dictated by the Seventh Circuit's decision on appeal of this Court's denial of a preliminary injunction. Applying the level of scrutiny applied by the Seventh Circuit on appeal, the Court finds that the challenged law is substantially related to Illinois' important public-safety interest. Therefore, Defendants' Motion for Summary Judgment (d/e 43) is GRANTED, and Plaintiffs' Motion for Summary Judgment (d/e 45) is DENIED.

# I. BACKGROUND

Plaintiffs include individuals who are residents of Wisconsin, Colorado, Missouri, Iowa, Pennsylvania, and Indiana[1] who would apply for a concealed carry permit if able and who would carry firearms in Illinois but fear prosecution.  The individual Plaintiffs, all of whom hold concealed carry licenses in their home states, work in or visit Illinois.  Plaintiffs also include three organizations, Second Amended Foundation, Inc., Illinois Carry, and Illinois State Rifle Association, who assert that they have many non-Illinois resident members who work in, travel to, and spend significant amounts of time in Illinois and would apply for concealed carry permits if able.  This Court previously found that Plaintiffs had standing to bring this lawsuit.  <u>Culp v. Madigan</u>, No. 14-CV-3320, 2015 WL 13037427, at *11 (C.D. Ill. Dec. 7, 2015) (<u>Culp I</u>).

Plaintiffs allege that Section 40 of the Illinois Firearm Concealed Carry Act (Concealed Carry Act) (430 ILCS 66/40) and all

---

[1] At oral argument, the parties advised the Court that Plaintiff Culp, who is a legal resident of Pennsylvania and who was stationed in Illinois when the case was filed, is now stationed in Ohio.

other statutory language that restricts otherwise-qualified nonresidents of Illinois of the rights and privileges of carrying concealed firearms based solely on their state of residence violates their Second Amendment rights, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Privileges and Immunities Clause of Article IV, § 2, and the Due Process Clause of the Fourteenth Amendment. Plaintiffs seek a declaratory judgment that Section 40 of the Concealed Carry Act and all other Illinois statutory language that restricts otherwise qualified nonresidents of Illinois of the rights and privileges of carrying concealed firearms based solely on their states of resident is unconstitutional. Plaintiffs also seek a permanent injunction barring enforcement of the challenged laws.

## A. Relevant Law Governing the Possession or Carrying of Firearms in Illinois

Two Illinois statutes govern the possession and carrying of firearms in Illinois: the Firearm Owners Identification Card Act (430 ILCS 65/0.01 et seq.,) (FOID Act) which permits qualified individuals to possess firearms, and the Concealed Carry Act (430

ILCS 66/1 et seq.), which permits qualified individuals to carry concealed handguns in public.  Nonresident applicants for a concealed carry license must meet all of the requirements for a FOID card except residency.

    1.   The FOID Act

The FOID Act generally prohibits a person from possessing a firearm in Illinois unless the person has a FOID card.  430 ILCS 65/2(a).  Among its many requirements, the FOID Act requires that an applicant be a resident, with certain exceptions.  See 430 ILCS 65/4(a-10).  In addition, the FOID Act allows nonresidents to possess a firearm in Illinois without a FOID card in certain instances, including where the nonresident is currently licensed or registered to possess a firearm in his resident state (430 ILCS 65/2(b)(10)); certain nonresident hunters (430 ILCS 65/2(b)(5), (13)); nonresidents while on a firing or shooting range (430 ILCS 65/2(b)(7)); nonresidents while at a firearm showing or display recognized by the Department of State Police (hereinafter referred to as the Illinois State Police or the ISP) (430 ILCS 65/2(8)); and

nonresidents whose firearms are unloaded and enclosed in a case (430 ILCS 65/2(9)).

An application for a FOID card may be denied or revoked based on the applicant's criminal or mental health history (among other reasons not relevant to the issues herein).  See generally 430 ILCS 65/8; see also 430 ILCS 65/4(a)(2) (requiring that an applicant submit evidence to the ISP that he meets the qualifications for obtaining a FOID card).  Grounds for denial include that the applicant has been convicted of a felony (740 ILCS 65/8(c)); has been convicted within the past five years of battery, assault, aggravated assault, violation of an order of protection, or a substantially similar offense in another jurisdiction in which a firearm was used or possessed (430 ILCS 65/8(k)); has been convicted of domestic battery, aggravated domestic battery, or a substantially similar offense in another jurisdiction before, on, or after January 1, 2012 (the effective date of Public Act 97-158, amending Section 8 of the FOID Act) (430 ILCS 65/8(l)); or is prohibited under an Illinois statute or federal law from acquiring or possessing a firearm or ammunition (430 ILCS 65/8(n)).  Those

prohibited by federal law from possessing a firearm include those convicted of a crime punishable by imprisonment for a term exceeding one year; persons adjudicated as a mental defective or who have been committed to a mental institution; and persons convicted in any court of a misdemeanor crime of domestic violence. See 18 U.S.C. § 922(g)(1), (g)(4), (g)(9).

In addition, the FOID card application may be denied or the license revoked if the person has been a patient in a mental health facility within the past five years (430 ILCS 65/8(e)); has been a patient in a mental facility more than five years ago and has not received a certification from a qualified examiner that he is not a clear and present danger to himself or others (Id.); has a mental condition of such a nature that it poses a clear and present danger to the applicant or other person or the community (430 ILCS 65/8(f)); or has been adjudicated a mentally disabled person (430 ILCS 65/8(r)).

The FOID Act also contains a reporting mechanism that allows the ISP to monitor the ongoing qualifications of FOID cardholders. See 430 ILCS 65/8.1.  For example, under the FOID Act, Illinois

circuit court clerks and other law enforcement agencies must notify the ISP of certain criminal arrests, charges, and disposition information.  <u>See</u> 430 ILCS 65/8.1(a); <u>see</u> <u>also</u> 20 ILCS 2630/2.1 (requiring the clerk of the circuit court, Illinois Department of Corrections, sheriff of each county, and state's attorney of each county to submit certain criminal arrests, charges, and disposition information to the ISP); 20 ILCS 2630/2.2 (requiring the circuit court clerk to report to the ISP's Firearm Owner's Identification Card Office convictions for certain violations of the Criminal Code when the defendant has been determined to be subject to the prohibitions of 18 U.S.C. 922(g)(9)).[2]  In addition, a court that adjudicates an individual as a mentally disabled person or finds that a person has been involuntarily admitted must direct the circuit court clerk to notify the ISP's FOID department and forward a copy of the court order to the ISP.  430 ILCS 65/8.1(b); <u>see</u> <u>also</u> 430 ILCS 65/8.1(b-1) (requiring that the circuit court clerk notify

---

[2] Providing that a person convicted of a misdemeanor crime of domestic violence cannot possess a firearm.  18 U.S.C. § 922(g)(9).

the ISP FOID department twice a year if the court has not directed the circuit clerk to notify the ISP FOID department under subsection (b) within the preceding six months because no person has been adjudicated a person with a mental disability or if no person has been involuntarily admitted).

The FOID Act further requires that the Department of Human Services (DHS) report to the ISP all information collected under subsection (b) of Section 12 of the Mental Health and Developmental Disabilities Confidentiality Act "for the purpose of determining whether a person who may be or may have been a patient in a mental health facility is disqualified under State or federal law from receiving or retaining a Firearm Owner's Identification Card, or purchasing a weapon." 430 ILCS 65/8.1(c). Section 12(b) of the Mental Health and Developmental Disabilities Confidentiality Act provides that all physicians, clinical psychologists, and qualified examiners must provide notice directly to DHS or his or her employer who shall then notify DHS within 24 hours of determining a person poses a clear and present danger to himself, herself, or others, or within 7 days after a person 14 years

or older is determined to be a person with a developmental disability as described in Section1.1 of the FOID Act.  740 ILCS 110/12(b).  Notice of an admission of a patient—which includes a person who voluntarily receives mental health treatment as an inpatient or resident or who receives mental health treatment as an outpatient and who poses a clear and present danger to himself, herself, or to others—must be furnished to DHS within seven days of admission.  Id.; see also 430 ILCS 65/1.1 (defining "patient").

Similarly, every physician, clinical psychologist, or qualified examiner who determines that a person poses a clear and present danger to himself or others must notify DHS within 24 hours of that determination.  430 ILCS 65/8.1(d)(1).  Further, a law enforcement official or school administrator who determines a person poses a clear and present danger to himself or others must notify the ISP within 24 hours of that determination.  430 ILCS 65/8.1(d)(2).

2.    The Concealed Carry Act

Illinois also provides a mechanism for individuals to carry a concealed firearm in Illinois by way of the Concealed Carry Act. 430 ILCS 66/1 et seq.  Illinois is a "shall issue" state, meaning that

the ISP must issue a license if the applicant meets the qualifications, provides the application and documentation required, submits the requisite fee, and does not pose a danger to himself or a threat to public safety as determined by the Carry Licensing Review Board.  430 ILCS 66/10(a).  The license is valid for five years and allows the licensee to carry a loaded or unloaded concealed or partially concealed firearm on or about his person and within a vehicle.  430 ILCS 66/10(c).

To qualify for a concealed carry license, the applicant must be at least 21 years of age; have a valid FOID card and, at the time of the application, meet the requirements for the issuance of a FOID card; have not been in residential or court-ordered treatment for alcoholism, alcohol detoxification, or drug treatment within five years immediately preceding the date of the application; and have completed firearms training.  430 ILCS 66/25(1), (2), (5), (6).  In addition, the Concealed Carry Act imposes additional requirements relating to the applicant's criminal history.  The applicant must not have been convicted or found guilty in any state of (A) a misdemeanor involving the use or threat of physical force or

violence to any person within five years preceding the date of the application or (B) two or more violations relating to driving while under the influence of drugs or alcohol within five years preceding the date of the application.  430 ILCS 66/25(3).  Moreover, the applicant must not be the subject of a pending arrest, warrant, prosecution, or proceeding for an offense or action that could lead to disqualification to own or possess a firearm.  430 ILCS 66/25(4).

The Concealed Carry Act requires that the ISP conduct a background check of the applicants for concealed carry licenses. 430 ILCS 66/35.  The background check must consist of a search of the following: the Federal Bureau of Investigation's National Instant Criminal Background Check System (NICS)[3]; all available state and local criminal history record information files, including records of juvenile adjudications; all available federal, state, and

_____

[3] According to the FBI website, NICS is a "national system that checks available records on persons who may be disqualified from receiving firearms." https://www.fbi.gov/services/cjis/nics/about-nics.  "The NCIS is a computerized background check system designed to respond instantly on most background check inquiries so the [Federal Firearms Licensees] receive an almost immediate response."  Id.

local records regarding wanted persons, domestic violence restraining orders, and protective orders; DHS files relating to mental health and developmental disabilities; and all other available records of any federal, state, local agency, or other public entity likely to contain information relevant to whether the applicant is prohibited from purchasing, possessing, or carrying a firearm. 430 ILCS 66/35. The ISP may charge applicants for conducting the criminal history records check but that fee shall not exceed the actual cost of the records check. Id.

The specific statutory provision Plaintiffs challenge here, Section 40 of the Concealed Carry Act, governs nonresident concealed carry license applications. Specifically, this section of the Concealed Carry Act directs the ISP to, by rule, allow for nonresident license applications from any state or territory of the United States with laws related to firearm ownership, possession, and carrying "that are substantially similar to the requirements to obtain a license under" the Concealed Carry Act. 430 ILCS 66/40(b). The ISP currently deems a state's law substantially similar when:

> [t]he comparable state regulates who may carry firearms, concealed or otherwise, in public; prohibits all who have involuntary mental health admissions, and those with voluntary admissions within the past 5 years, from carrying firearms, concealed or otherwise, in public; reports denied persons to NICS; and participates in reporting persons authorized to carry firearms, concealed or otherwise, in public through NLETs [sic] [(the National Law Enforcement Telecommunications System)[4]].

20 Ill. Admin. Code § 1231.10. The four states currently deemed to have substantially similarly laws are Arkansas, Mississippi, Texas, and Virginia. See https://www.ispfsb.com/Public/Faq.aspx (all websites last visited September 15, 2017).

Only a nonresident applicant from a state with substantially similar laws may apply for a nonresident concealed carry license. 430 ILCS 66/40(c). The nonresident must meet all of the requirements contained in section 25 of the Concealed Carry Act, except for the Illinois residency requirement. 430 ILCS 66/40(c). The nonresident must submit the application and documents

---

[4] NLETS "is the premiere interstate justice and public safety network in the nation for the exchange of law enforcement-, criminal justice-, and public safety-related information." http://nlets.org/about/who-we-are. The ISP uses NLETS to determine if a nonresident's state-issued concealed carry license is valid. Trame Aff. ¶ 13 (d/e 44-1).

required under Section 30 of the Concealed Carry Act and the
applicable fee. 430 ILCS 66/40(c)(1). The fee for a new license or
renewal is $150 for an Illinois resident and $300 for a nonresident.
430 ILCS 66/60(b), (c).

Nonresidents are also required to meet additional
requirements. 430 ILCS 66/40. A nonresident applicant must
submit a notarized document affirming that he is eligible to own or
possess a firearm under federal law and the laws of his state or
territory of residence; that, if applicable, he has a license or permit
to carry a firearm, concealed or otherwise, issued by his state; that
he understands Illinois law pertaining to the possession and
transport of firearms; and acknowledges that he is subject to the
jurisdiction of the ISP and Illinois courts for any violation of the
Concealed Carry Act. 430 ILCS 66/40(c)(2); see also 430 ILCS
66/40(c)(3), (4) (requiring the applicant to submit a photocopy of
any evidence of compliance with the training requirements and a
head and shoulder color photograph). In lieu of an Illinois driver's
license or Illinois identification card, the nonresident applicant
must provide similar documentation from his state or territory of

residence.  430 ILCS 66/40(d).  In lieu of a valid FOID card, the nonresident applicant must submit the documentation and information required to obtain a FOID card, including an affidavit that the nonresident meets the mental health standards to obtain a firearm under Illinois law.  430 ILCS 66/40(d) (also requiring that the ISP ensure the applicant would meet the eligibility criteria to obtain a FOID card if he were an Illinois resident).

The Concealed Carry Act specifically provides that nothing in the Act prohibits a nonresident who does not have an Illinois concealed carry license from transporting a concealed firearm in his or her vehicle if the concealed firearm remains in the vehicle and the nonresident is not prohibited from owning a firearm under federal law and is eligible to carry a firearm in public under the laws of his state of residence.  430 ILCS 66/40(e).  If the vehicle is unattended, however, the firearm must be stored within a locked vehicle or a locked container.  Id.

The Concealed Carry Act imposes an additional reporting obligation on schools.  Section 105 requires that school administrators report to the ISP when a student of a public or

private elementary school, secondary school, community college, college, or university is determined to pose a clear and present danger to himself or others within 24 hours of such determination. 430 ILCS 66/105.

3. <u>The ISP Sends Surveys to Other States and the District of Columbia</u>

Pursuant to 20 Ill. Admin. Code § 1231.110(c), the ISP sent Surveys to determine if other states had "substantially similar" firearms laws. Trame Aff. ¶¶ 26-30 (d/e 44-1). Specifically, in 2013, the ISP sent Surveys to each of the 49 other states and the District of Columbia requesting information regarding their regulation of firearms use and reporting and tracking mechanisms relative to criminal activity and mental health issues. <u>Id.</u> ¶ 26. In 2014, the ISP sent a second Survey to those states which did not respond to the first Survey. <u>Id.</u> The following states did not respond to the ISP's 2013 or 2014 requests for information: Colorado, Maine, Maryland, Massachusetts, Nevada, Pennsylvania, and Rhode Island. <u>Id.</u> ¶ 27. Of those states responding to the 2013 Survey, only Hawaii, New Mexico, South Carolina, and Virginia were

found to have laws similar to Illinois' laws by regulating who may carry firearms in public, reporting persons authorized to carry firearms though NLETS, reporting denied persons through NICS, prohibiting persons voluntarily admitted to a mental health facility within the last five years from possessing or using firearms, and prohibiting persons involuntarily admitted to mental health facilities from possessing or using firearms.  Id. ¶ 28.

In 2015, the ISP again sent Surveys to each of the 49 other states and to the District of Columbia requesting information regarding their regulation of firearm use and reporting and tracking mechanisms relative to criminal activity and mental health issues. Trame Aff. ¶ 29.  ISP Firearms Services Bureau staff telephoned the states which did not respond to the 2015 Survey to follow up on the status of the states' responses.  Id.  Colorado and Maryland never responded to the 2015 Survey.  Id. ¶ 30.

The 2015 Survey asked:

1.  Does your state issue a Concealed Carry License?

    a.  If YES, for what length of time is the license issued?

b.  At what age can an individual apply for a Concealed Carry License?

2.  Is a National Instant Criminal Background Check System (NICS) background check completed at the time of issuance of a Concealed Carry License?

a.  Is a secondary/repeated background check conducted after the initial application approval process during the lifetime of the license/permit?

3.  Does your state report Concealed Carry Licenses via the National Law Enforcement Teletype System (NLETS)?

4.  Does your state prohibit the use or possession of firearms based on adjudication as a mentally defective person or committed [sic] to a mental institutional (18 U.S.C. 922(g)(4))?

5.  Does your state report adjudicated mentally defective/committed persons to the NICS Index?

a.  If YES, please describe your state's collection/reporting process in accordance with 18 USC 922(g)(4).

b.  If YES, is there a mechanism within the state to check for the federal mental health prohibitor during the lifetime of the license/permit?

6.  Does your state prohibit the use or possession of firearms based on a voluntary mental health admission within the last <u>five</u> years?

a.  If YES, are mental health admissions reported to your agency by any entity other than the applicant?

If YES, to 6.a., please describe.

b.  If YES, does the applicant provide information concerning their mental health status at the time of application?

c.  If YES, is there any check or validation of the information provided by the applicant?

If YES to 6.c., please describe.

d.  If YES, please provide your state statute reference.

e.  If NO, does your state have any process for prohibiting the use or possession of firearms based on a voluntary mental health admission to a treatment facility?

If YES to 6.e., please describe.

7.  If you answered NO to any of the questions 4-6, does your state have any other procedures for the consideration of mental health and the use or possession of firearms?

a.  If YES, please describe.

8.  If you answered NO to any of the questions 4-6, is there pending state legislation that addresses the concern of mental health treatment and the possession of firearms?

a.  If YES, what is the effective date?

b.  If YES, please provide a copy of the legislative language.

<u>See</u> 2015 Survey (d/e 44-2).  The ISP found that only four states

had laws that were substantially similar to Illinois' laws: Arkansas,

Mississippi, Texas, and Virginia.  <u>See</u>

https://<u>www.ispfsb.com/Public/Faq.aspx.</u>

**B.    The Court Denied Plaintiffs' Motion for Preliminary Injunction, and the Seventh Circuit Affirmed**

On August 7, 2015, after the close of fact discovery, Plaintiffs

filed a Motion for Preliminary Injunction (d/e 17).  The Court held a

hearing on the Motion and, on December 4, 2015, denied the

Motion.  <u>Culp I</u>, 2015 WL 13037427.  The Court applied

intermediate scrutiny and found that Plaintiffs demonstrated "at

least a better-than-negligible likelihood of success on the merits."

<u>Id.</u> at *16; <u>see also</u> <u>id.</u> at *17 (finding the likelihood of success

"neither strong nor weak").  The Court also found that Plaintiffs

could show irreparable harm and no adequate remedy at law.  <u>Id.</u> at

*16.  The Court denied the Motion, however, because the balance of

harms and the public interest weighed in favor of denying the

preliminary injunction.  <u>Id.</u> at *17-18.

On October 20, 2016, the Seventh Circuit affirmed the denial
of Plaintiffs' Motion for Preliminary Injunction, with Judge Daniel A.
Manion dissenting. <u>Culp v. Madigan</u>, 840 F.3d 400 (7th Cir. 2016)
(<u>Culp II</u>). The majority noted that Plaintiffs' claim to be allowed to
carry concealed firearms when visiting Illinois "would be compelling
if the Illinois authorities could reliably determine whether in fact a
nonresident applicant for an Illinois concealed-carry license had all
of the qualifications that Illinois, or states that have concealed carry
laws substantially similar to Illinois, require to be met." <u>Id.</u> at 402.
However, while Illinois state police have access to information about
Illinois residents, such information is not reliably accessible
regarding nonresident applicants, except in the four substantially
similar states. <u>Id.</u> (also noting Jessica Trame's "uncontradicted
affidavit" regarding the sources the Illinois Firearms Services
Bureau relies on in determining eligibility). The majority noted that,
while Illinois can request information from local jurisdictions in
other states, those jurisdictions charge a fee, and the Bureau lacks
the funds to pay the charges. <u>Id.</u> at 403. The Bureau has also
encountered significant difficulties in its efforts to obtain mental

health information about residents of other states, as many states do not track such information.  Id.

The majority also noted Illinois' need for reliable information to monitor the holders of gun permits.  Culp II, 840 F.3d at 403. Illinois checks its own databases daily and national databases quarterly for updates that might require a license to be revoked but cannot obtain such updates from states that do not track or report that information.  Id.

The majority recognized that Plaintiffs made "some apt criticism of the Illinois law."  Id.  For example, an Illinois resident can travel to another state and Illinois authorities will not know if he committed a crime or suffered a mental breakdown while in that other state if it is not one of the four states with substantially similar firearm laws.  Id.  In addition, anyone who lives in Illinois or one of the four substantially similar states can obtain an Illinois concealed carry license even if he became a resident of that state recently after years of living in a dissimilar state—and Illinois would be unable to obtain information about possible criminal or mental problems in that dissimilar state.  Id.

Although the majority concluded the law was imperfect, the majority found it could not say the law was "unreasonable, so imperfect as to justify the issuance of a preliminary injunction." Culp II, 840 F.3d at 403. The majority stated:

> The critical problem presented by the plaintiffs' demand—for which they offer no solution—is verification. A nonresident's application for an Illinois concealed-carry license cannot be taken at face value. The assertions in it must be verified. And Illinois needs to receive reliable updates in order to confirm that license-holders remain qualified during the five-year term of the license. Yet its ability to verify is extremely limited unless the nonresident lives in one of the four states that have concealed-carry laws similar to Illinois' law. A trial in this case may cast the facts in a different light, but the plaintiffs have not made a case for a preliminary injunction.

Id.

The dissenting judge disagreed with what he called the rational-basis review applied by the majority. Id. at 404 (Manion, J., dissenting). The dissenting judge concluded that "the nonresident application ban functions as a categorical prohibition of applications from the majority of Americans" and constituted a severe burden on Second Amendment rights. Id. at 407. Accordingly, the dissenting judge applied a level of scrutiny greater

than intermediate scrutiny but not quite strict scrutiny and held that Defendants had to show a close fit between the law and a strong public interest.  Id.  Applying that level of scrutiny, the dissenting judge stated that Illinois' chosen method of regulating "nonresident concealed-carry license applications is not sufficiently tailored to its goal of properly vetting out-of-state applicants' criminal and mental histories." Id. at 404.  The dissenting judge also noted the over-inclusive and under-inclusive sweep of the statute, which undercut Illinois' justification for maintaining the nonresident application ban.  Id. at 408-09.  The dissenting judge further found that Illinois had not shown that it would be impossible or impracticable for out-of-state residents to provide verified records that would satisfy Illinois' requirements.  Id. at 409. Nonresidents could pay for criminal searches and provide relevant records to Illinois.  Id.  Nonresident applicants could also obtain certification that they satisfy Illinois's mental health requirements. Id. "Potential applicants should at least be given that chance." Id.

**C.    The Parties Filed Cross Motions for Summary Judgment**

In January 2017, the parties filed cross motions for summary judgment.  On August 22, 2017, the Court held oral argument on the motions.

Defendants support their Motion for Summary Judgment with the affidavit of Jessica Trame, the Bureau Chief of the ISP Firearms Services Bureau.  Trame is responsible for administering the FOID Program, the Firearms Transfer Inquiry Program, and the Concealed Carry Licensing Program and is familiar with the protocols and procedures of each program.  Trame Aff. ¶ 2 (d/e 44-1).  Trame explains the difficulty of verifying nonresident applicants' identities, criminal history, mental health information, and obtaining updated nonresident information necessary to revoke a concealed carry license.  The affidavit submitted in support of summary judgment is substantially the same as the affidavit submitted at the preliminary injunction stage but includes additional information regarding the 2015 Survey.  See id.; see also Trame Supp. Aff. (d/e 52-1) (explaining that the ISP recently

reviewed the 2015 Survey data and determined that Arkansas, Mississippi, Texas, and Virginia have substantially similar laws).

According to Trame, the Firearms Services Bureau performs a background check on each applicant for a concealed carry license. Trame Aff. ¶ 4. This background check process is intended to ensure public safety by identifying persons who are unqualified to carry firearms. Id. ¶ 8.

The background check includes queries of the national systems such as the National Crime Information Center (NCIC),[5] NICS, the Interstate Identification Index,[6] Immigration and Customs

---

[5] This is the mechanism criminal justice agencies use to access over 13 million active records. The NCIC database consists of 21 files, including 14 "persons" files such as the National Sex Offender Registry, Foreign Fugitives, Immigration Violations, Orders of Protection, and Wanted Persons. See Trame Aff. ¶ 13. "The NCIC has operated under a shared management concept between the FBI and federal, state, local, and tribal criminal justice users since its inception." See https://www.fbi.gov/services/cjis/ncic

[6] The Interstate Identification Index is the national criminal history record system. See Trame Aff. ¶ 13. As of March 31, 2016, 30 states and the District of Columbia participate only in the Interstate Identification Index while 20 states participate in Interstate Identification Index and the National Fingerprint File. https://www.fbi.gov/services/cjis/compact-council/interstate-identification-index-iii-national-fingerprint-file-nff

Enforcement, and NLETS. The Bureau also checks the Illinois systems, including the Criminal History Record Information system, driver's license or identification systems maintained by the Secretary of State, and the Computerized Hot Files system, which is "a central online repository for numerous officer and public safety information repositories" that is maintained by the ISP. Trame Aff. ¶ 6.

For Illinois residents, the Firearm Services Bureau is able to locate criminal history through Illinois' Criminal History Record Inquiry, a system maintained by ISP; the Computerized Hot Files; and from federal systems. Id. ¶ 11. Because the Bureau does not have direct access to other states' local or state criminal history databases, the Bureau relies on federal databases to obtain out-of-state criminal history information. Id. ¶ 12. Trame indicates, however, that many states provide the federal databases with only a summary of an arrest. This information is often inadequate to assess an applicant's eligibility for a concealed carry license. Id. Although the ISP may request a criminal record if the federal database is incomplete, many jurisdictions charge for records, and

the ISP does not have funds appropriated to pay for any records. Id.

The ISP uses NLETS to determine whether a nonresident applicant's state-issued concealed carry license is valid and to check the continued validity of the home-state issued concealed carry license. Trame Aff. ¶ 13. The ISP is unable to obtain accurate and updated information via NLETS and NCIC for residents from states which do not fully participate in those systems. Id. ¶ 14.

In addition, information from the Interstate Identification Index may be limited because states are not uniform in their reporting of different levels and types of offenses. Id. ¶ 15. Only the National Fingerprint File (NFF) provides detailed extracts directly from states' local databases. Id. However, as of December 2016, only 20 states participate in the NFF: Colorado, Florida, Georgia, Hawaii, Idaho, Iowa, Kansas, Maryland, Minnesota, Missouri, Montana, North Carolina, New Jersey, New York, Ohio, Oklahoma, Oregon, Tennessee, West Virginia, and Wyoming. Id.

Through the Illinois Department of Human Services FOID Mental Health System, the Firearm Services Bureau can access

information on Illinois mental health facility admissions and determine whether an individual has been involuntarily admitted into a mental health facility in Illinois or been a patient in a mental health facility in Illinois within the past five years or more.  Trame Aff. ¶ 17.  This System does not, however, contain records on out-of-state mental health facility admissions.  Id. ¶ 18.  In addition, the ISP does not have access to other states' mental health facility admission databases, to the extent the other states may have them. Id.

Trame states that, in her experience, federal databases contain only limited information regarding involuntary mental health admissions or mental disability adjudications and do not contain voluntary mental health admission information.  Trame Aff. ¶ 19. To search for mental health information regarding nonresidents, the ISP is limited to information available through the NICS Index, which contains some information regarding individuals prohibited from firearm possession for mental health reasons under 18 U.S.C. § 922(g)(4) (making it unlawful for any persons who has been adjudicated as a mental defective or who has been committed to a

mental institution from possessing a firearm).  Id. ¶ 20.  Moreover,

not all states participate in the NICS Index.  Id. ¶ 20.  NICS does

not provide any information on voluntary mental health admissions.

Id.

On a daily basis, all resident concealed carry license holders

are checked against the Illinois Criminal History Record Inquiry and

DHS Mental Health Systems (by virtue of their FOID card) for any

new conditions that would disqualify them from holding a FOID

card or a concealed carry license.  Trame Aff. ¶ 21.  All concealed

carry license holders, both resident and nonresident, are checked

against the federal databases on a quarterly basis.  Id.

Trame explains in her affidavit why it is difficult for the

Firearm Services Bureau to obtain updated nonresident information

relevant to revoking a concealed carry license.  Trame states that,

while Illinois physicians, law enforcement officials, and school

administrators are required to report persons that may be a clear

and present danger to themselves or others, the ISP does not

receive reports from out-of-state physicians, law enforcement

officials, or school administrators concerning out-of-state persons

presenting a clear and present danger.  Id. ¶ 22.  Moreover, daily

checks of the DHS Mental Health Systems would not reveal

information concerning persons in other states.  Id.

In addition, Illinois circuit clerks must report to ISP persons

who have been adjudicated as mentally disabled or those

involuntary admitted to a mental health facility.  Trame Aff. ¶ 23.

Trame is not aware of any other state that is required to, or does,

report such cases to ISP.  Id.  Similarly, DHS must report to ISP

information collected pertaining to voluntary and involuntary

mental health treatment admissions, as well as patients with

intellectual or development disabilities or those who have been

deemed to be a clear and present danger.  Id. ¶ 24.

The ISP can request information from out-of-state mental

health entities, but many of the out-of-state mental health entities

do not provide mental health information even after an ISP request.

Id. ¶ 24.  According to Trame, the ISP's lack of access to this type of

data held by other states would make it virtually impossible to

effectively conduct the level of screening and monitoring on

nonresident concealed carry license applications that is performed
on resident applicants.  Id. ¶ 25.

## II. LEGAL STANDARD

Summary judgment is proper if the movant shows that no
genuine dispute exists as to any material fact and that the movant
is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).
The movant bears the initial responsibility of informing the court of
the basis for the motion and identifying the evidence the movant
believes demonstrates the absence of a genuine issue of material
fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  No
genuine issue of material fact exists if a reasonable factfinder could
not find in favor of the nonmoving party.  Brewer v. Bd. of Trs. of
the Univ. of Ill., 479 F.3d 908, 915 (7th Cir. 2007).  When ruling on
a motion for summary judgment, the court must consider the facts
in the light most favorable to the nonmoving party, drawing all
reasonable inferences in the nonmoving party's favor.  Blasius v.
Angel Auto., Inc., 839 F.3d 639, 644 (7th Cir. 2016).

## III. PLAINTIFFS' REQUEST FOR DISCOVERY

As an initial matter, the Court notes that Plaintiffs assert, in their response to Defendants' Motion for Summary Judgment, that they should have been allowed a brief period to disclose expert witnesses and conduct limited discovery. Pls. Resp. at 7 (d/e 56). Plaintiffs claim that the "entire pendency of this case involved a preliminary injunction Motion and the appeal thereof." Id. Plaintiffs also state that they incorrectly believed that when the appeal was concluded in favor of Defendants there would be a period of time for discovery before dispositive motions were due. Plaintiffs argue that, at a minimum, Defendants' motion should be denied and any factual disputes fleshed out through an abbreviated discovery process.

Plaintiffs' contention that the entire pendency of this case involved a preliminary injunction and an appeal is incorrect. The record reflects that Plaintiffs had the opportunity to conduct discovery and failed to do so.

Plaintiffs filed suit in October 2014. In March 2015, United States Magistrate Judge Tom Schanzle-Haskins entered a

Scheduling Order (d/e 16).  The Scheduling Order provided the following deadlines: (1) Plaintiffs shall identify testifying experts and provide Rule 26 expert reports by July 24, 2015; (2) Defendants shall identify testifying experts and provide Rule 26 expert reports by September 22, 2015; (3) the parties shall complete fact discovery by June 24, 2015; (4) the parties shall complete expert discovery by October 22, 2015; and (5) the parties shall file dispositive motions by November 23, 2015.  Id.

On August 7, 2015, after the close of fact discovery, Plaintiffs filed the Motion for Preliminary Injunction (d/e 17).  On October 16, 2015, the Court held a hearing on the Motion.  On November 23, 2015, Defendants filed a Motion for Summary Judgment (d/e 27).

On December 4, 2015, the Court issued a decision denying Plaintiffs' Motion for Preliminary Injunction (d/e 29).  Plaintiffs appealed, and the Seventh Circuit affirmed.  Culp II, 840 F.3d 400.

On November 16, 2016, following the issuance of the mandate, this Court entered a text order setting the dispositive motion deadline for December 28, 2016 and setting trial and pretrial dates. On December 23, 2016, Plaintiffs filed a motion (d/e 38) seeking an

extension of time to complete discovery and to file motions for summary judgment. Plaintiffs indicated that they wanted the opportunity to disclose an expert witness and allow Defendants the opportunity to depose that witness. Plaintiffs also wanted the opportunity to depose Defendant's main witness, Jessica Trame, and obtain any updated records from Defendants regarding the issues in the case.

On January 3, 2017, Judge Schanzle-Haskins denied Plaintiffs' request to reopen discovery. Opinion and Order (d/e 42). Judge Schanzle-Haskins found that Plaintiff had the opportunity to conduct discovery in this case prior to the discovery deadline but did not do so. Id. at 9. For example, Defendants served Plaintiffs with interrogatories, which asked Plaintiffs to identify any persons who would offer opinion testimony in the case. Id. at 8. Plaintiffs never responded or objected to the interrogatories. Id. In addition, Defendants disclosed Jessica Trame in their initial Rule 26 disclosures. Id. Plaintiffs could have deposed Trame anytime between April 16, 2015 and the close of expert discovery on October 22, 2015. Id. at 9. Plaintiffs apparently made no attempt to take

Trame's deposition.  Id.  Judge Schanzle-Haskins extended the dispositive motion deadline to January 13, 2017.  Plaintiffs did not object to this Order.  See Fed. R. Civ. P. 72(a) (providing that a party may object to a magistrate judge's ruling on a nondispositive matter within 14 days after being served with the order and that the party "may not assign as error a defect in the order not timely objected to").

This Court could consider the issue sua sponte and allow discovery if the Court finds Judge Schanzle-Haskins' Order clearly erroneous or contrary to law.  See Fed. R. Civ. P. 72(a); Schur v. L.A. Weight Loss Ctrs., Inc. 577 F.3d 752, 760-61 (7th Cir. 2009) (noting that the district judge is not precluded from reviewing a magistrate judge's order even when a party does not object).  The Court finds that the Order was neither clearly erroneous nor contrary to law and, therefore, will not reopen discovery.  The Court now turns to the merits of the motions for summary judgment.

## IV. ANALYSIS

Plaintiffs seek a permanent injunction barring enforcement of Section 40 of the Concealed Carry Act and all other Illinois

statutory language that restrict otherwise-qualified nonresidents of Illinois from carrying concealed firearms based solely on their states of residence. To obtain a permanent injunction, Plaintiffs must prevail on the merits and demonstrate: (1) irreparable injury; (2) inadequate remedy at law; (3) that the balance of hardships favors a remedy in equity; and (4) that the public interest would not be disserved by a permanent injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); Sierra Club v. Franklin Cnty. Power of Ill., LLC, 546 F.3d 918, 935 (7th Cir. 2008).

Plaintiffs move for summary judgment, asserting that Illinois' licensing mechanism is discriminatory and unconstitutionally burdens the exercise of Plaintiffs' constitutional rights.

Defendants move for summary judgment asserting that the challenged regulations are reasonably related to Illinois' important and substantial interest in protecting the public by ensuring initial and continued eligibility for concealed carry licenses and Illinois' related interest in obtaining information necessary to make those determinations.

**A.      Defendants are Entitled to Summary Judgment on Plaintiffs' Second Amendment Claim**

The Second Amendment of the United States Constitution

provides:

> A well regulated Militia, being necessary to the security of
> a free State, the right of the people to keep and bear
> Arms, shall not be infringed.

U.S. Const. amend. II.  In <u>District of Columbia v. Heller</u>, the United

States Supreme Court held that there is a guaranteed "individual

right to possess and carry weapons in case of confrontation" based

on the Second Amendment.  <u>Heller</u>, 554 U.S. 570, 592 (2008) (also

holding that the Second Amended "codified a <u>pre-existing</u> right")

(emphasis in original).  Consequently, the Court found that the

District of Columbia's ban on handgun possession in the home

violated the Second Amendment.  <u>Id.</u> at 635.

Nonetheless, the Court recognized that the right was not

unlimited, and that:

> nothing in our opinion should be taken to cast doubt on
> longstanding prohibitions on the possession of firearms
> by felons and the mentally ill, or laws forbidding the
> carrying of firearms in sensitive places such as schools
> and government buildings, or laws imposing conditions
> and qualifications in the commercial sale of arms.

Id. at 627 (also recognizing that limits on the carrying of dangerous and unusual weapons may be imposed); see also McDonald v. City of Chi., 561 U.S. 742, 750 (2010) (finding the Second Amendment fully applicable to the states through the Due Process Clause of the Fourteenth Amendment).

A two-step framework applies when resolving Second Amendment cases. The Court first determines whether the regulated activity falls within the scope of the Second Amendment, and, if so, examines the "strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." Ezell v. City of Chi., 651 F.3d 684, 703 (7th Cir. 2011) (Ezell I).

Here, Defendants agree that the regulated conduct falls within the scope of the Second Amendment. Defs. Mot. at 11 (d/e 44); see also Moore v. Madigan, 702 F.3d 933, 942 (7th Cir. 2012) ("The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside."); Southerland v. Escapa, 176 F. Supp. 3d 786, 790 (C.D.

Ill. 2016) (Myerscough, J.) (finding that the acts criminalized by the Illinois statute, "the ability to openly carry any firearm, as well as the ability to carry a concealed firearm aside from pistols, revolvers, and handguns, is clearly within the scope of the Second Amendment"). Therefore, the issue here is the strength of Defendants' justification for restricting or regulating the exercise of Second Amendment rights. See Ezell v. City of Chi., 846 F.3d 888, 892 (7th Cir. 2017) (Ezell II) (noting that the government bears the burden of justifying the law under a heightened standard of scrutiny).

Under the second step of the framework, the Court must examine the "regulatory means the government has chosen and the public-benefits end it seeks to achieve." Ezell I, 651 F.3d at 703. The rigor of this review depends on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." Id.; see also Ill. Ass'n of Firearms Retailers v. City of Chi., 961 F. Supp. 2d 928, 935 (N.D. Ill. 2014) ("[T]he level of scrutiny applied varies according to the breadth of the challenged Second Amendment restriction").

Broad prohibitory laws restricting core Second Amendment rights are likely categorically unconstitutional. Ezell I, 651 F.3d at 703 (citing Heller and McDonald, which involved regulations that prohibited handgun possession in the home). For other laws, however, the appropriate standard of review is somewhere between intermediate and strict scrutiny. As Heller made clear, a rational-basis review is inappropriate in the Second Amendment context. Heller, 554 U.S. at 628 n.27 (holding that "if all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect"); Ezell II, 846 F.3d at 892 (rational-basis review does not apply to laws restricting Second Amendment rights).

When a court applies a standard closer to intermediate scrutiny, the law must be substantially related to an important government interest. See Horsley v. Trame, 808 F.3d 1126, 1132 (7th Cir. 2015) (finding the law "substantially related to the achievement of the state's interests"); United States v. Shields, 789 F.3d 733, 750 (7th Cir. 2015) (concluding that "keeping firearms

out of the hands of violent felons is an important objective and, because the defendant was a violent felon, applying § 922(g)(1) to the defendant was substantially related to that objective"). When a court applies a stronger form of intermediate scrutiny—one closer to strict scrutiny—the government must demonstrate a strong public-interest justification for the law and a close fit between the law and the public interests the law serves. Ezell I, 651 F. 3d at 708-09; Culp II, 840 F.3d at 407 (noting that when a law "curtails the fundamental right of law-abiding citizens to carry a weapon for self-defense," the government must show a close fit between the law and a strong public interest) (Manion, J., dissenting).

In deciding the appropriate level of scrutiny here, this Court has the benefit of the Seventh Circuit's decision on appeal of the denial of a preliminary injunction. Although the Court finds the dissent in Culp II to be a well-reasoned analysis, this Court is bound by the holding of the majority, which appears[7] to find that

---

[7] This Court says "appears" because the dissent accuses the majority of applying a rational-basis review based on the majority holding that the "application ban" was not unreasonable. Culp II, 840 F.3d at 404. However, precedent clearly establishes that a rational-basis review is never applied in the

intermediate scrutiny—and not the near-strict scrutiny applied by the dissent—applies.  Culp II, 840 F.3d at 403; Sierra Club v. Khanjee Holding (US) Inc., 655 F.3d 699, 704 (7th Cir. 2011) ("Matters decided on appeal become the law of a case to be followed on a second appeal, unless there is plain error of law in the original decision.").  Applying that level of scrutiny, the Seventh Circuit found, based on the evidence presented at that point, including the uncontroverted affidavit of Trame, that the law was not unreasonable or so imperfect as to justify the issuance of a preliminary injunction.  Culp II, 840 F.3d at 403.  The majority noted, however, that a trial in the case may cast the facts in a different light.  Id.

---

Second Amendment context.  In addition, several courts have used the term "reasonable" when applying intermediate scrutiny.  See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 700 F.3d 185, 207 (5th Cir. 2012) (applying intermediate scrutiny to regulations prohibiting firearms dealers from selling handguns to persons under age 21 and examining whether the law was "reasonably adapted to an important government interest"); Ezell I, 651 F.3d at 708 (noting that, in commercial-speech cases, intermediate scrutiny requires a reasonable fit between the legislature's ends and the means chosen to accomplish those ends).

On summary judgment, Plaintiffs attempt to controvert Trame's affidavit and cast the facts in a different light. Plaintiffs argue that the issues raised by Trame in her Affidavit are outside the scope of the Concealed Carry Act. While this argument is not entirely clear, Plaintiffs seem to be arguing that, under the statutes, Illinois does not play any role in verifying compliance or qualifications of applicants but is limited to checking the available database and records. See Pls. Mem. at 11 (d/e 46) (stating that the applicant is responsible for ensuring eligibility); at 13 ("Defendants cannot deny an application if they either choose to use an imperfect database, or if they get a less than perfect response from their inquiries."); at 13 (the statutes do allow for out-of-state law enforcement objections); at 15 ("The actual reading of the law does not require 'verification' but instead requires the check be made of the six listed categories."); at 15-17 (appearing to suggest that the ISP cannot verify nonresident mental health information under the statutes because nonresidents only have the burden of providing additional notarized statements, affidavits, and other listed documents and that the statute does not allow an application

to be denied if the ISP has difficulty obtaining a "perfect investigation").  According to Plaintiffs, if the available databases and records do not contain information that would bar the applicant, then the State must issue the license.

The Court disagrees that Trame's affidavit is outside the scope of the Act.  The Concealed Carry Act provides that the ISP shall ensure that applicants comply with the requirements of the Act as a condition for licensure.  See 430 ILCS 66/35 ("The Department shall conduct a background check of the applicant to ensure compliance with the requirements of this Act and all federal, State, and local laws."); see also 430 ILCS 66/40(d) ("[T]he Department shall ensure that the applicant would meet the eligibility criteria to obtain a Firearm Owner's Identification card if he or she was a resident of this State."); 430 ILCS 66/10 (directing the Department to issue licenses if the applicant, among other things, "meets the qualifications of Section 25 of [the] Act.").  In addition, as the majority in Culp II noted, "[a] nonresident's application for an Illinois concealed-carry license cannot be taken at face value.  The assertions in it must be verified." Culp II, 840 F.3d at 403.  Finally,

to the extent Plaintiffs argue that the legislature did not grant the ISP authority to deny licenses for lack of information, the legislature has expressly directed the ISP to accept applications only from Illinois residents or nonresidents from states having substantially similar firearm laws.  <u>See</u> 430 ILCS 66/40(c).  An applicant from a state with dissimilar laws is not denied because of a lack of information about the applicant but because the applicant is not from a qualifying state.  Therefore, the Court finds that Trame's Affidavit is relevant evidence.

Plaintiffs also assert that Illinois' laws governing nonresidents are arbitrary, pointing to what Plaintiffs contend are discrepancies regarding the Surveys Illinois conducted of other states.  Some of the discrepancies Plaintiffs cite appear to have been caused by the fact that Illinois sent out a Survey in 2015 but did not determine which states had substantially similar laws until after Plaintiffs filed their Motion for Summary Judgment in January 2017.

For example, Plaintiffs argue that, as of January 2017, Illinois recognized South Carolina as having substantially similar laws even though South Carolina answered "no" to questions about voluntary

mental health admissions and the question whether South Carolina reported concealed carry licenses via NLETS.  Pls. Mem. at 36 (d/e 46) (citing 2015 Survey Response).  However, South Carolina was deemed to have substantially similar laws after receipt of the 2013 Survey, in which South Carolina responded "yes" to all of the questions.  After Illinois received the 2015 Survey responses—to which South Carolina responded that it did not report concealed carry license via NLETS and did not prohibit use or possession of firearms based on a voluntary mental health admission within the last five years—Illinois determined that South Carolina no longer had substantially similar laws.  Compare 2013 Survey (completed in March 2014) (d/e 44-1 at 50 of 87) with 2015 Survey (d/e 44-2 at 142-43 of 166).

Plaintiffs also argue that New Mexico answered the 2013 and 2015 Surveys the same way but was removed from the substantially similar list after the 2015 Survey.  Pls. Resp. at 40 (d/e 56).   However, in the 2013 Survey (which New Mexico responded to in May 2014), New Mexico answered "yes" to the question, "Does your state prohibit the use or possession of

firearms based on a voluntary mental health admission within the last five years?" <u>See</u> New Mexico Resp. to 2013 Survey (d/e 44-1 at 41 of 87). In response to the same question in 2015, New Mexico answered "no." <u>See</u> New Mexico Resp. to 2015 Survey (d/e 44-2 at 120 of 166).

Plaintiffs next argue that Arkansas and New Mexico answered the 2015 Survey the same way but only Arkansas is currently deemed to have substantially similar laws. Pls. Resp. at 40. Defendants explain, however, that Arkansas clarified its 2015 Survey response by stating that while there "are no blanket prohibitions on use or possession based on a voluntary admission" within the last five years, an Arkansas applicant is ineligible for a concealed carry license if the applicant has <u>ever</u> been voluntarily admitted to a mental health facility. Arkansas Resp. to 2015 Survey (d/e 44-2 at 15 of 166). New Mexico provided no such clarification.

Plaintiffs argue that Virginia answered "no" to the question asking whether Virginia conducts an NICS background check when Virginia issues a concealed carry license but that Illinois still found

Virginia had substantially similar laws.  Pls. Resp. at 41.

Defendants explain that Virginia answered "yes" to the question:

"Does your state report adjudicated mentally defective/committed

persons to the NICS Index."  <u>See</u> Virginia Resp. to 2015 Survey (d/e

44-2 at 158 of 166).  According to Defendants, the question Virginia

answered "yes" to is the critical question for purposes of § 1231.10

and tracks the third requirement of § 1231.10—that the state report

denied persons to NICS.  Defendants further assert that the

"substantially similar" definition does not require that states

conduct background checks through NICS.  <u>See</u> 20 Ill. Admin. Code

§ 1231.10 (only defining "substantially similar" as including a state

that reports denied persons to NICS).

Plaintiffs also fault the ISP for finding Mississippi substantially

similar because Trame, in her affidavit, attested to the difficulty of

obtaining criminal history information from Mississippi.  <u>See</u> Trame

Aff. ¶ 12 (giving Mississippi as an example of a state that reports

limited information to the Interstate Identification Index and

requires a fee for criminal history information, as much as $80 for a

search of the two criminal courts and two civil courts in just one

county).   Defendants explain that, when the Affidavit was prepared, Mississippi had not been deemed to have substantially similar laws and that Trame provided a truthful example of the difficulty of obtaining criminal history information from a state that did not fully participate in federal or multi-state systems.  Defendants further state that Mississippi is currently deemed a substantially similar state because Mississippi now participates in reporting persons authorized to carry firearms, concealed or otherwise, in public through NLETS, which was a change from the 2013 Survey Response.  <u>Compare</u> Mississippi 2013 Survey Response (d/e 44-1 at 34 of 87) <u>with</u> 2015 Survey Resp. (d/e 44-2 at 106 of 166).

The only "discrepancy" that Plaintiffs cite that appears to have some merit is the claim that Virginia is deemed to have substantially similar laws even though Virginia has no official mechanism for the reporting of <u>voluntary</u> admissions to a mental health treatment facility.  Specifically, while Virginia law prohibits use or possession of firearms based on a voluntary mental health admission within the last five years, Virginia relies on self-reporting and does not have a systematic way of checking voluntary

admissions.  <u>See</u> Virginia 2015 Survey Resp. (d/e 44-2 at 158-59 of 166).

This shows that Illinois' law is not perfect and could call into question the genuineness of Illinois' alleged need to track voluntary admissions.  However, Virginia qualified as a substantially similar state because the definition of "substantially similar" in the regulation requires that the state's law prohibit those with voluntary mental health admissions within the past five years.  20 Ill. Admin. Code § 1231.10.  Virginia met that requirement.

Turning to the merits, the Court finds that Illinois has an important and compelling interest in its citizens' safety.  <u>Schall v. Martin</u>, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted.").  Plaintiffs argue, however, that Defendants have no proof that keeping concealed handguns out of the hands of nonresidents is needed to protect the public.  In particular, Plaintiffs cite to scholarly articles suggesting that firearm permit holders—like Plaintiffs, all of whom hold concealed carry licenses in

their home state—are at a low risk of misusing guns.  See Pls. Resp. at 43-45.

Long-standing prohibitions on the possession of firearms by felons and the mentally ill are permissible.  Heller, 554 U.S. at 627; Moore, 702 F.3d at 940 ("And empirical evidence of a public safety concern can be dispensed with altogether when the ban is limited to obviously dangerous persons such as felons and the mentally ill."). If prohibitions on the possession of firearms by felons and the mentally ill are permissible, a state must have a way of determining whether an applicant is a felon or mentally ill.

Illinois' laws are designed to ensure that felons and the mentally ill do not obtain concealed carry licenses.  In addition, Illinois' laws are designed to monitor those who have concealed carry licenses to ensure that the license holders remain qualified. Specifically, the FOID Act and the Concealed Carry Act impose reporting requirements on circuit clerks, physicians, mental health providers, law enforcement agencies, school administrators, and the Department of Human Services so that the ISP can monitor license holders.  In addition, Illinois uses federal and Illinois electronic

databases to verify initial eligibility and monitor continued eligibility for concealed carry licenses. On a daily basis, Illinois checks all resident concealed carry license holders against the Illinois Criminal History Record Inquiry and DHS Mental Health Systems. Trame Aff. ¶ 21. Illinois checks all concealed carry license holders, both resident and nonresident, against the federal databases on a quarterly basis. Id.

If another state does not have substantially similar firearm laws as Illinois' laws, Illinois cannot confirm that nonresidents from that state are qualified to hold and maintain an Illinois concealed carry license. For instance, one way Illinois can monitor nonresidents is by use of NLETS. The ISP checks NLETS to confirm that a nonresident's concealed carry license in his home state remains valid. If another state has substantially similar firearm laws and reports concealed carry licenses via NLETS, then Illinois can verify that the nonresident applicant continues to meet Illinois' requirements.

The Court recognizes that Illinois' firearm laws relating to nonresidents is not perfect. Nonetheless, the law is substantially

related to achieving Illinois' interest in keeping the concealed carry licenses out of the hands of felons and the mentally ill. See Culp II, 840 F.3d at 403 (finding at the preliminary injunction stage, on substantially the same evidence, that Illinois' firearms laws relating to nonresidents met intermediate scrutiny). Illinois has a substantial interest in restricting concealed carry licenses to those persons whose qualifications can be verified and monitored. The restriction barring nonresidents from states without substantially similar laws from applying for an Illinois concealed carry license is substantially related to that strong public interest. Consequently, the Court finds that the challenged laws do not violate the Second Amendment.

## B.     Defendants are Entitled to Summary Judgment on the Remaining Counts

Plaintiffs also claim that the nonresident application regulation/ban is unconstitutional under the Equal Protection Clause, Due Process Clause, and Privileges and Immunities Clause. However, because the nonresident application regulation/ban passes scrutiny under the Second Amendment, then the

regulation/ban passes scrutiny under the other provisions because they do not require a stronger showing.

The Equal Protection Clause requires strict scrutiny of a legislative classification when the classification impermissibly interferes with the exercise of a fundamental right or operates to the disadvantage of a suspect class. Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 312 (1976). Where a Second Amendment challenge fails, some courts have held that the equal protection claim is subject to rational basis review and other have held the claims is subject to intermediate scrutiny. See, e.g., Kwong v. Bloomberg, 723 F.3d 160, 170 n.19 (2d Cir. 2013) (noting that "courts have applied 'rational basis' review to Equal Protection claims on the theory that the Second Amendment analysis sufficiently protects one's rights); Flanagan v. Harris, No. LA CV 16-06164 JAK (ASx), 2017 WL 729788, at *6 (C.D. Cal. Feb. 23, 2017) (holding that when a law survives a Second Amendment challenge and does not involve a suspect classification, courts have applied rational basis review to equal protection claims, the rationale being that the Second Amendment analysis sufficiently protects the individual's rights);

United States v. Hayes, No. No. 2:14-CR-72-PPS, 2014 WL 5390553, at \*3 (N.D. Ind. Oct. 22, 2014) (noting that the Seventh Circuit has used intermediate scrutiny to review Second Amendment and Equal Protection challenges to some restrictions on gun ownership).  In any event, a more stringent level of review does not apply under the Equal Protection Clause than under the Second Amendment in this case.

Plaintiffs argue that the nonresident application ban violates the Privileges and Immunities Clause of Article IV of the Constitution, which provides that "[t]he Citizens of each State [are] entitled to all Privileges and Immunities of Citizens in the several States."  U.S. Const. Art. IV § 2, cl. 1.  The purpose of this Clause was "intended to 'fuse into one Nation a collective of independent, sovereign States.'"  Supreme Court of N.H. v. Piper, 470 U.S. 274, 279 (1985) (quoting Toomer v. Witsell, 334 U.S. 385, 395 (1948)). In light of the purpose of the Clause, the United States Supreme Court has held that the State must accord residents and nonresidents equal treatment "[o]nly with respect to those privileges and immunities bearing on the vitality of the Nation as a single

entity." <u>Piper</u>, 470 U.S. at 279 (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Minix v. Canarecci</u>, No. 305-CV-144-RM, 2007 WL 1662666, at *3 (N.D. Ind. June 6, 2007). Examples of fundamental privileges protected by Article IV's Privilege and Immunities Clause include pursuit of a common calling and rights to travel and migrate interstate. <u>See</u> <u>United Bldg. & Constr. Trade Council of Camden Cnty & Vicinity v .Mayor & Council of City of Camden</u>, 465 U.S. 208, 219 (1984); <u>Zobel v. Williams</u>, 457 U.S. 55, 78-79 (1982) (O'Connor, J., concurring in the judgment).

When a law deprives nonresidents of a privilege or immunity protected by the Privilege and Immunity Clause, the law is invalid unless (1) there is a substantial reason for the difference in treatment; and (2) the discrimination against nonresidents bears a substantial relationship to the State's objectives. <u>Barnard v. Thorstenn</u>, 489 U.S. 546, 552 (1989). Even if the right to bear arms constitutes a privilege under the Privilege and Immunities Clause, the standard—requiring a substantial relationship to the State's objectives—is equal to or less than the standard that applies in the

Second Amendment context in this case. Therefore, Plaintiffs have not shown a violation of the Privilege and Immunities Clause.

Finally, Plaintiffs are not entitled to relief on their Fourteenth Amendment procedural due process claim. When analyzing a procedural due process claim, the Court asks (1) whether there exists a liberty or property interest of which the person has been deprived, and (2) whether the procedures followed were constitutionally sufficient. <u>Swarthout v. Cooke</u>, 562 U.S. 216, 219 (2011); <u>Ky. Dep't of Corr. v. Thompson</u>, 490 U.S. 454, 460 (1989). Plaintiffs assert a liberty or property interest arising out of the Second Amendment. However, because this Court has found no Second Amendment violation, Plaintiffs have not demonstrated that they were deprived of a property or liberty interest.

## V. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (d/e 43) is GRANTED and Plaintiffs' Motion for Summary Judgment (d/e 45) is DENIED. THIS CASE IS CLOSED.

**ENTER: September 15, 2017**

**FOR THE COURT:**

                              __s/Sue E. Myerscough__
                              **SUE E. MYERSCOUGH**
                              **UNITED STATES DISTRICT JUDGE**